**LOUISBURG SPORTSWEAR COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 14338.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 11, 1970.

Decided April 20, 1972.

Addendum July 12, 1972.

Richard C. Keenan, New Orleans, La. (Kullman, Lang, Keenan, Inman & Bee, New Orleans, La., Paul Thompson, and Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., on the brief), for petitioner.

Frank Vogl, Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Paul J. Spielberg, Atty., N. L. R. B., on the brief), for respondent.

Neil D. Lipton, Asst. Gen. Counsel (Jacob Sheinkman, Gen. Counsel, Amalgamated Clothing Workers of America, AFL–CIO, on the brief), for intervenor.

Before HAYNSWORTH, Chief Judge, and BRYAN, Circuit Judge, and MARTIN, District Judge.

HAYNSWORTH, Chief Judge:

As so many labor cases, this one involves a tangle of factual contentions underlying, among other things, a bargaining order. Since we decline enforcement of some of the major portions of the Board's order, the factual situation requires attention in some detail.

I

On July 10, 1967, Amalgamated Clothing Workers of America began an organizing campaign among the employees of Louisburg Sportswear Co. It met with some initial success, and when the union had obtained cards signed by 94 of the 180 employees it demanded recognition and sought an election. The company declined recognition, and the vote in the election went against the union 121 to 39.

The Board found that the company had committed unfair labor practices which invalidated the election, and concluded that they were so pervasive and outrageous as to warrant the imposition of a bargaining order whether or not the union ever had a valid card majority and that the union had had such a majority and the unfair labor practices were sufficiently widespread and serious as to make the cards a more reliable indication of employee wishes than a rerun election. It ordered a cessation of all unfair labor practices and, affirmatively, recognition of the union and bargaining with it.

II

*Discharges of Rich and Rice*

On June 14, 1967, almost a month before the union's advent, Linda Rich and Eleanor Rice were discharged. There was testimony that earlier, in the presence of their foreman they had made such remarks as, "We need a union in here (to prevent the discharge of a supervisor)" and had told him they had mailed cards to the International Ladies Garment Workers Union. There was testimony that they were discharged by the plant manager for persistent refusals to follow prescribed methods in their work. The employees, themselves, admitted that sometimes, instead of pressing garments separately as required, they would press a stack of them together, but they denied that they had done so with the frequency claimed by company witnesses. On the basis of generalized supporting testimony, however, the Board found that they were no worse than other employees. It concluded that the real reason for their discharge was their prounion disposition.

Viewing the testimony in the light most favorable to the finding, as we must, we cannot say that it lacks substantial evidentiary support. Their reinstatement with back pay will be ordered, though it should be observed that these two discharges, occurring when there was no organizational activity and approximately four weeks before Amalgamated even arrived on the scene, could not have had a tendency to undermine a previously existing union majority. Occurring at a time when there was no union activity, other employees were not likely to have ascribed to those discharges an anti-union motivation. The

admittedly slovenly work performance was the only generally visible reason for their discharges.

### III

#### Surveillance

On July 20, ten days after Amalgamated's campaign began, Vick, the plant manager left the plant and drove in his automobile into the town of Louisburg. His route took him by a motel, the town's only hostelry, in which the union's professional organizer was lodged. As he passed the motel, a woman in an automobile, parked in front of it, covered her face with a newspaper and slumped into the front seat. Vick said he thought this extraordinary, so he turned around and drove back by the motel. The automobile was then apparently empty, but Vick recorded the number on the license tag and returned to his office. There was testimony that Vick was seen the next day in the plant's parking area looking at license tags.

It may be that Vick's inquisitiveness may have been the product of the idle curiosity of a small town's resident, but the Board was warranted in its conclusion that Vick's turnaround and his recording of the license tag number stemmed from his concern about the union's organizational effort.

The Board's proscription against such surveillance will be enforced.

### IV

#### The Refusal to Re-employ Boone

The woman who sought to conceal her identity from Vick was a Mrs. Overton, but that episode is crucial to the finding that the company wrongfully refused to re-employ Mrs. Boone.

In August 1967, Louise Boone requested a leave of absence to work in harvesting tobacco. Her request was denied, because, according to company witnesses, granting such leaves could create a mass exodus which would restrict the plant's capacity in the harvest season. She left anyhow, to work in harvesting tobacco.

The day before the scheduled election on October 12, she telephoned to inquire about re-employment. She was told there were no available jobs for her. In November she applied in person, took some job qualification tests and left.

The Board found that her denial of re-employment in November, weeks after the October election, was because of her advocacy of the union in August. It reasoned that Boone and Overton, who hid her face in the preceding episode, were partners in a car pool, each using her car on alternate days. When Vick saw a woman, whom we now know to have been Overton, hide her face and recorded her license tag, said the Board, he must have known that her car-pool partner, Boone, was in the motel consulting with Amalgamated's organizer. Support for this is found in the testimony that the next day, Vick was seen looking at cars in the parking lot, though, if Overton and Boone were credited, Overton's car, the one Vick saw in front of the motel, would not have been in the parking lot the next day.

This is much too tenuous. If Vick identified the automobile as Overton's after he recorded its license tag, despite its absence from the parking lot the next day, that would not justify an inference that her friend and associate was in the motel consulting or working with Amalgamated's organizer. There was no evidence that Vick knew that Overton and Boone were car-pool partners. Even if he did, Overton's conduct would reasonably suggest that she was engaged in conduct which she wished concealed from Vick, but not that someone else was engaged in such conduct.

Vick testified that it was important to have employees upon whom he could depend during tobacco picking seasons. When Boone quit to pick tobacco, she demonstrated her undependability on that score and was not re-employed for that reason. We do not find substantial evidence of his having any other purpose or motive, when he was not shown to have known that she had been an active supporter of the union in Au-

gust. In that connection, it is appropriate to observe that there is no claim that any other supporter of Amalgamated's effort was discharged or disciplined.

## V

### Increase in Benefits

The Board found that Louisburg violated § 8(a) (1) of the Act during the course of the campaign by announcing a wage increase, an increase in hospitalization benefits and a liberalized grievance procedure. Though the record does not show to what extent the existing grievance procedure was liberalized by the announcement, the company has not contested that finding, and we, of course, accept it. We do not think the finding of illegality in the announcement of the wage increase and the hospital benefit was warranted.

In August 1966, Vice-President Costa became the general manager of three plants, one of them being Louisburg. At that time the basic production rates[1] were fixed at minimum wage levels, but Costa adopted a policy of maintenance of basic production rates at a level exceeding the minimum wage by some fifteen to sixteen per cent. Almost immediately after Costa assumed charge of the operation of this plant in 1966, the base rate was increased from $10 per day, which was the minimum wage at that time, to $11.20 a day. In anticipation of an increase in the minimum wage which was to be effective in February 1967, Costa again increased the wages in December 1966 to $12.80 a day. The minimum wage was scheduled for another increase in February 1968 and according to testimony of witnesses offered by the company, planning for the next increase was begun in the spring of 1967, and its amount and implementation were agreed upon in early July.

On July 24, 1967 an increase of eighty cents per day was announced to be ef-

fective on September 5, with yet another increase of $1.20 a day to be effective in February 1968 at the time the minimum wage increase became effective. The increases announced in July were effective in each of the three plants under Costa's supervision, though there was no union activity in either of the other two.

The fact the wage increases were uniform in all three plants was ignored and the company's evidence about the planning for the wage increases announced in July 1967 was rejected on the basis of testimony by some employees that until July 1967 there never had been a wage increase except to maintain the basic rate at a level equal to the minimum wage rate. Those witnesses were obviously mistaken. The previous year Costa had raised the rates to a level well above the minimum, and the increase in December 1966 gave assurance of his intention to maintain the rates at proportionately higher levels. The testimony of witnesses demonstrably misinformed and mistaken furnishes no adequate basis for rejecting the company's evidence which was, itself, consistent with an apparently established pattern of wage increases.

Wage increases during union organizing campaigns are not forbidden, unless the increase is granted and announced for the purpose of restraining employees in the free exercise of their right of choice. Such a purpose is negated if it can be shown that the announcement is consistent with established company practice, or was planned and settled upon before the organizing campaign began.[2] The evidence here meets the criteria for validity of the wage increase.

Had the Board found that a purpose to influence the employees at Louisburg in their choice determined the timing of the announcement of the wage increases in the three plants, we might well sustain the Board. We cannot sustain the Board's finding that there would have

---

1. Most of the employees were on piece rates designed to permit the average employee to make, or exceed, the base production rate. Many of the employees did exceed it. The law, of course, required that every employee receive at least the minimum wage.

2. Lincoln Manufacturing Co. v. N.L.R.B., 7 Cir., 382 F.2d 411.

been no increase at Louisburg except for the union's presence on the scene.

During the course of the campaign an increase in hospital benefits was also announced. Reference had been made in a speech to the fact that Louisburg had long provided hospitalization benefits equal to local charges for semi-private rooms in hospitals. Following the speech, it was discovered that the local rate for such a room had been increased from $15 to $16.50 per day. Accordingly, the rate payable under the hospitalization plan was similarly adjusted.

Clearly, this increase in the hospitalization benefit payable was consistent with established practice and policy. The benefit was hinged to the local charge for a semi-private room, and Louisburg was obligated to increase the benefit when the local rate was increased. The fact that the increase in the local rate was discovered in the course of the campaign and the resulting adjustment announced does not take the matter out of established policy or warrant an inference that established policy was not the predominant reason for the increase.

## VI

### Election Interrogation

■ There was evidence that several weeks before the election a supervisor in the lowest echelon was engaged in a general conversation with one of the employees. During the course of that conversation the supervisor asked the employee how she intended to vote in the election. The employee indicated some indecision, and the supervisor dropped the subject.

In this incident there clearly was no persistence and "no unnatural formality." The employee was not summoned to the manager's office; she was engaged in a casual and general conversation with a supervisor of the lowest rank in circumstances which gave no sugges-

tion of a purpose to seek information as a basis for retaliatory action. There were no other circumstances suggesting coercion, and the record is barren of any other incidents of interrogation.

We conclude that the inference of coercion from this incident is impermissible.[3]

## VII

### Speeches and Letters

The company met the union's propaganda with vigorous propaganda of its own, substantially all of which the Board found coercive and unlawful, and without the protection of § 8(c) of the Act.

In principal part, the company's propaganda consisted of factual accounts, taken largely from newspaper reports, of labor strife in southern industrial plants. These accounts of incidents, in some of which Amalgamated was involved, reported many acts of violence by striking employees, bombings and shootings into the homes of nonstrikers and destruction of company property. One of them, an account of a strike at a mill in Alabama reported an Amalgamated organizer as having said the strike will continue "until we have a contract or the company owners pack up and move out. We prefer the latter." Additionally, the company distributed a comment on N. L. R. B. v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed. 2d 1123, in which a union's right to fine members who had crossed picket lines was upheld, together with an account of another case in which a union member was fined for failing to attend a meeting scheduled at a time which conflicted with her attendance at church.

This material portrayed Amalgamated and other unions in a most unfavorable light. It was unrelieved by references to the good unions, though the company might reasonably have supposed that the union would supply that part of the picture. It is not contended, however, that

3. Bourne v. N.L.R.B., 2 Cir., 332 F.2d 47; N.L.R.B. v. Camco, Inc., 5 Cir., 340 F.2d 803; N.L.R.B. v. Century Broadcasting Corp., 8 Cir., 419 F.2d 771; N.L. R.B. v. Seamprufe, Inc., 10 Cir., 382 F.2d 820. Cf. N.L.R.B. v. Lexington Chair Co., 4 Cir., 361 F.2d 283.

the disseminated accounts were untrue or inaccurate in any respect. Nor did the material contain anything to suggest to anyone that Louisburg would resort to violence or instigate it, or do anything adverse to the interest of its employees.

■ If this propaganda was not balanced, it concerned events beyond the employer's control with no hint of a threat of coercive activity by this employer. It is the kind of propaganda that § 8(c) was intended to protect, as is made plain in N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547. *See, also,* N. L. R. B. v. Gotham Industries Inc., 1 Cir., 406 F.2d 1306.

■ *Gissel* dealt specifically with a threat of plant closure, but the Court took pains to recognize an employer's right to tell employees of his views about unions, or a particular union, as long as his story does not contain a "threat of reprisal or force or promise of benefit." He may even predict the future consequences of unionism if the predicted consequences are outside of his control. An employer thus may not threaten that it will take certain action if the employees vote for the union, if the threatened action is subject to the employer's volition, but he is free to tell of consequences beyond his control.

■ *Gissel* had not been decided when this propaganda was disseminated, but it is clearly within the range of permissible speech as defined in *Gissel.*

Some of the incidents described in the propaganda involved plant closures. There was a report of a plant that closed after an extended strike, another of a plant that closed after eight months of fruitless negotiation, and a third of a plant which remained in operation during a year long strike, but closed after its power transformers were destroyed and union pickets around a power pole on city property prevented city employees from making necessary repairs. In each of these instances the closure of the plant was not a voluntary act on the part of the employer in retaliation against employees for having joined a union. Each account left the impression that the employer had done all it reasonably could to keep the plant in operation, and that plant closure had come despite the employer's wishes.

Otherwise, Louisburg took pains to make it clear that if the union was selected by the employees, it would deal with the union. There were statements that it could exist only so long as it produced quality goods at competitive prices, but there was no hint that it would not sign a contract which would permit it to do that, or that it would take any retaliatory step of any sort.

There were references to an employer's right to hire replacements for economic strikers. They were concededly correct statements of the law and they were couched in language easily understood by employees. They were not characterized as economic strikers, for instance, but the situation was put in terms of a strike for the purpose of enforcing contract demands.

In short, by emphasizing its duty and willingness to bargain with the union if the employees selected it, without any hint of retaliation or even of obstinacy, the threat of voluntary retaliation inherent in the *Gissel* statement was avoided and the employer's campaign was within the protection of § 8(c).

## VIII

### The Bargaining Order

The unfair labor practices which occurred seemed to have had a minimal impact upon the union's campaign. The discharges of Rich and Rice occurred weeks before the union's advent. The refusal to re-employ Boone, even if it were held to have been an unfair labor practice, occurred only after the election. The surveillance of Overton and the statement of the grievance procedures were the only unfair labor practices occurring during the campaign which might have tended to undermine the union's strength and, except that we do not know to what extent the grievance procedure

modified earlier practice, it would seem calculated to have had little effect upon the union's strength.

This is certainly not a first category case under *Gissel* in which a bargaining order is authorized whether or not a union ever obtained a majority. It probably is not a second category case, but, if it is, there is no substantial evidence that Amalgamated ever obtained a majority of valid cards.

The Board treated 94 cards, a majority of four, as valid, despite the fact that a number of them were challenged as having been obtained on the basis of representations which contradicted the printed language on the cards.

The language of the card was an unequivocal designation of the union as a bargaining representative of the signers. There was testimony, however, that many of them, obtained by Amalgamated's organizer, Barnes, and William Foster, were obtained with representations that the cards were sought for the purpose of obtaining an election, and that the cards would be effective and binding only if an election were held and the union won. This testimony was credited by the Board, but was disregarded on the ground that the card signers could not have failed to understand the clear meaning of the printed words.

■ This resolution of the matter misses the point for the card is invalid for the purpose of a card check if its language is clearly contradicted by contrary representations.

The Board, of course, considered this matter initially before the Supreme Court's decision in *Gissel*, and apparently did not reconsider the validity of the cards when the case was later remanded for consideration in light of *Gissel*. The Supreme Court in *Gissel*, however, made it abundantly clear that the validity of the cards, for the purpose of a card count, were to be considered under a lib-

eralized *Cumberland Shoe*[4] rule. The Supreme Court said explicitly:

"[E]mployees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled out by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 606, 89 S.Ct. 1918, 1936, 23 L.Ed. 2d 547.

■ The record here clearly establishes that a number of the cards were obtained on the basis of representations which "deliberately and clearly" canceled the printed words within the meaning of the Supreme Court's decision in *Gissel*.

For such reasons, we decline enforcement of the Board's bargaining order.

Enforced in part; enforcement denied in part.

ADDENDUM:

On a motion for modification of this opinion by the National Labor Relations Board, our interpretation of the Board's decision is questioned to the extent that we construed that decision to order bargaining whether or not a card majority ever existed. This interpretation was prompted by our examination of the language of the Board's decision in light of the language of *Gissel*. The Board disclaims any policy or authority under existing Board decisions to order bargaining in the absence of a card majority and states that this has been the Board's practice both before and after *Gissel*. In this case, the Board relied on its finding that at "times material herein" the union represented a majority of the employees. Therefore, our opinion should not be read as a statement that the Board's bargaining order had a secondary basis independent of the finding of a card majority or as implying that the Board, in this or any other case, has exercised an authority it now disclaims.

4. Cumberland Shoe Corp., 144 N.L.R.B. 1268 (1963).