**FAMET, INC., Petitioner &
Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent & Cross-
Petitioner.**

No. 73–1832.

United States Court of Appeals,
Ninth Circuit.

Dec. 27, 1973.

Rehearing Denied Feb. 6, 1974.

Herbert S. Matthews, South San Francisco, Cal., for petitioner & cross-respondent.

Elliot Moore, Acting Asst. Gen. Counsel, NLRB, Washington, D. C., Roy O. Hoffman, Regional Director, NLRB, San Francisco, Cal., Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Charles I. Cohen, NLRB, Washington, D. C., for respondent & cross-petitioner.

International Ass'n. of Machinists & Aerospace Workers, AFL–CIO, Local #1327, Burglingame, Cal., for charging party.

Before ELY, HUFSTEDLER, and SNEED, Circuit Judges.

### OPINION

ELY, Circuit Judge:

The Board's Decision and Order is reported at 202 NLRB No. 52. Famet, Inc. (hereinafter the "employer") has filed a Petition in which we are urged to review and set aside the Decision and Order, and the Board has filed a cross-application for the enforcement of its Order.

The controversy, as presented here, has been reduced to the question of whether the employer violated section 8(a)(3) and (1) of the National Labor Relations Act by discharging an employee, one Rutledge, because of his protected union activities.

We need not review the facts in detail, inasmuch as they are fully set forth in the Board's reported Decision. We shall, however, briefly restate such of the relevant circumstances as are essential to an understanding of the problem. Rutledge was discharged by one Katshen, who was the employer's plant manager, as well as its vice-president and majority stockholder. The employer is a relatively small enterprise, having, at the relevant time, approximately eleven employees. All of these employees worked during the same hours and had their break for luncheon at the same time. The employer's operations were conducted on two floors of a building, and work benches were located on both of the two floors. Katshen maintained an office on the second floor, but he also had a work bench on the first floor.

There was abundant evidence of the fact that Katshen was antagonistic to trade unions and their activity, and his union animus was clearly established.

The employer hired Rutledge as a machinist on April 1, 1969, and his discharge occurred on November 12, 1971. During this period of approximately two and one-half years, the employer had given several increases in pay to Rutledge so that his beginning wage rate of $3.25 per hour had, at the time of his discharge, been increased to the rate of $4.95 per hour.

In early November of 1971, Rutledge visited the headquarters of a certain union to discuss the possibility of that union's representation of him and his fellow employees. He was given certain information and supplied with a number of union authorization cards. Rutledge immediately went to his place of work

and distributed a card to each of all of the employees, save one.

In the morning of November 12, 1971, Katshen, while distributing pay checks, observed Rutledge talking to an employee named Aiello. Katshen delivered to Rutledge and Aiello their pay checks but said nothing about having observed their conversation. During the following lunch period, however, Katshen directed a foreman, one Staudt, to notify Rutledge (and Rutledge only) that he, Rutledge, had been seen talking, rather than working. Katshen further directed the foreman to admonish Rutledge about this. As Rutledge was returning from his lunch, another employee warned Rutledge that he had learned from an employee named Beardslee that Katshen was aware that union activities were occurring within the plant. Shortly thereafter, when foreman Staudt conveyed Katshen's warning to Rutledge, Rutledge remarked "It's no longer a secret, and the cat's out of the bag." Rutledge also advised Staudt to take a neutral stand because "They have enough on [Katshen]", and "They were going to get him." Staudt then reported these remarks directly to Katshen and also told Katshen that two other employees, Stahl and Chasco, were also involved. Katshen made no inquiries of Staudt concerning the asserted involvement of Stahl and Chasco. Katshen then proceeded to Rutledge's place of work, asked Rutledge about his reported threat "to get me", and Rutledge denied having made such threat. Foreman Staudt was thereupon summoned to repeat that which he had previously reported to Katshen, whereupon Katshen discharged Rutledge, handing him two paychecks which he, Katshen, had evidently already caused to be prepared. The only additional relevant testimony of consequence pertained to certain of Katshen's activities subsequent to his discharge of Rutledge. This evidence was largely to the effect that Katshen had openly addressed the employees, stating *inter alia*, that he did not like unions and that unions would do the employees

no good. There was also testimony to the effect that Katshen had told at least two employees that he did not like unions, and if the two employees desired to work for a union shop, they should seek employment elsewhere.

The critical question, as both the Board and the employer recognize, is whether there was substantial evidence to support the Board's finding that Katshen knew of Rutledge's union activity prior to the discharge. If there is support for that finding, the Board's conclusion that Rutledge was unlawfully discharged is, without question, justified.

██ It is well settled that the Board's finding that an employer knew of an employee's union activity may be supported by circumstantial evidence. NLRB v. Miller Redwood Co., 407 F.2d 1366, 1369 (9th Cir. 1969); Santa Fe Drilling Co. v. NLRB, 416 F.2d 725, 729 (9th Cir. 1969). This must be true, since direct evidence of one's actual knowledge is not always available. The Board's Decision necessarily rested, to some extent, upon inferences which it drew from the evidentiary facts. If the inferences supporting the Board's Decision were reasonable, then we must credit them, even though we might have drawn opposing inferences, also reasonable, from the same facts. NLRB v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); NLRB v. Holly Bra of Calif., Inc., 405 F.2d 870, 872 (9th Cir. 1969). *See also*, NLRB v. Lowell Sun Publishing Company, 320 F.2d 835, at 840 (1st Cir. 1963). The inference that an employer knows of an employee's union activities has been deemed especially reasonable "where, as here, the employee in question engaged in in-plant union activity and the plant is relatively small." A. J. Krajewski Manufacturing Company v. NLRB, 413 F.2d 673, at 676 (1st Cir. 1969). In the Decision and Order under review, the Board emphasized the comparatively small number of employees and the close-knit nature of the employer's operation. Although Chairman Miller disa-

greed, the majority of the Board apparently thought it inconceivable that Katshen in the circumstances, was ignorant of Rutledge's union activity prior to the latter's discharge. All of the foregoing leads us to the conclusion that we have no justifiable choice save to enforce the challenged Order. The case is close, however, and we think it not inappropriate to remind the Board that it must exercise especially careful judgment in a case such as this and that it carries the burden of proof. NLRB v. Lowell Sun Publishing Company, *supra*. Our distinguished Brother Aldrich of the First Circuit wrote, 320 F.2d at 842: "Where a party has two motives, one permissible and the other impermissible, the better rule is what we [have] indicated, namely, that the improper motive must be shown to have been the dominant one." The Board recognized the validity of this rule in the Decision and Order now under review.

■ The Board must be as impartial as the courts, serving both union and management, as well as the public at large, with impartiality. If the Board applies this principle—and we think that it almost always does—then it will not invite unto itself such biting criticism as appears in NLRB v. Billen Shoe Co., 397 F.2d 801 (1st Cir. 1968). We need not reiterate the criticism there written, but we do remind the Board that in reviewing Board determinations of the kind here questioned, we will always have in mind the concluding language of Judge Aldrich in *Billen*:

> "If we were to draw a further lesson from this case, and too many others like it that we have had, it is that it is all too easy to say that adequate cause for discipline was seized upon as pretextual in the case of union representatives. The fact is that adequate cause for discharge is of peculiarly legitimate concern in such instances; management cannot run its plant if union organizers can ride roughshod on the basis of their position. When good cause for criticism or discharge

appears, the burden which is on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one. The mere existence of anti-union animus is not enough. The fact that the employer may be pleased to effectuate the discharge does not mean that this was his primary motive."

NLRB v. Billen Shoe Co., *supra*, at 803.

The Board's Order will be

Enforced.