509 F.2d 490
 88 L.R.R.M. (BNA) 2072, 166 U.S.App.D.C. 157,
75 Lab.Cas. P 10,519
 CHAUFFEURS, TEAMSTERS AND HELPERS, LOCAL 633 OF NEW
HAMPSHIRE, affiliated with the International
Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of
America, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD.
 No. 73--1704.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 31, 1974.
Decided Dec. 23, 1974.
 
 Angelo V. Arcadipane, Washington, D.C., for petitioner.
 Charles P. Donnelly, Atty., N.L.R.B., of the bar of the Supreme Court of Texas, pro hac vice, by special leave of court with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert A. Giannasi, Asst. Gen. Counsel, N.L.R.B., were on the brief for respondent.
 Before BAZELON, Chief Judge, and WRIGHT and McGOWAN, Circuit Judges.
 BAZELON, Chief Judge:
 
 
 1
 George Law is Treasurer of and owns a controlling interest in three sister transport corporations based in Nashua, New Hampshire. The largest of these three, Law Motor Freight, employed in June, 1972, approximately 80 non-supervisory workers and recognized as the sole bargaining representative of those employees Teamster Local 633. The other two corporations were respectively Bulk Haulers, Inc., which employed six non-supervisory workers, and Law Warehouses, Inc., which employed five non-supervisory workers. Neither of these two corporations had recognized a union in June of 1972. Ronald Hall was employed as a driver for Law Motor Freight in May, 1970, and pursuant to a then-existing union security agreement between Law Motor Freight and Local 633 became a member of the Teamsters. In November of 1970, Hall was transferred to Bulk Haulers where he was assigned to deliver certain shipments of liquor under a contract between Bulk Haulers and the New Hampshire State Liquor Commission. His immediate supervisor in that job was one Charles McKay and McKay's immediate superior was Henry Therriault. Stephen McKay was hired subsequent to Hall and also drove for Bulk Haulers under the supervision of Charles McKay and Therriault.
 
 
 2
 In November, 1971, after some tension between Hall and Therriault over a few late deliveries by Hall, Hall contacted Local 633 and held a meeting at his home which included Stephen McKay, a representative of the union and himself. Hall later spoke with at least two other drivers about the union on the telephone and at the terminal of Bulk Haulers. Sometime between November 23 and December 5, 1971, Therriault called Stephen McKay into his office and questioned him about union. On December 9, 1971, Therriault fired Ronald Hall. On December 14, 1971, Local 633 filed unfair labor practice charges against Bulk Haulers. On January 31, 1972, the General Counsel of the National Labor Relations Board filed a complaint alleging that Bulk Haulers had violated § 8(a)(1) of the National Labor Relations Act[1] by questioning Stephen McKay and had violated § 8(a)(1) and (3)[2] by discharging Ronald Hall. The Trial Examiner found against the General Counsel on both counts and the Labor Board adopted without opinion the trial examiner's findings and order.[3] Local 633 petitions this Court to review and set aside this order. Finding the Union's arguments persuasive, we reverse and remand the case for proceedings consistent with this opinion.
 
 I. The Questioning of Stephen McKay
 
 3
 We first turn to the alleged violation of § 8(a)(1) through the questioning by Therriault of employee Stephen McKay. According to the trial examiner, Therriault initiated the questioning by calling McKay into the company's conference room. Therriault then asked McKay whether McKay had been approached by the union, adding that McKay did not have to answer this question if he did not wish to. McKay stated in response that he had indeed been approached by the union. Therriault then remarked that he expected that sooner or later Bulk Haulers would go union but that McKay would be wise to ensure that the benefits obtained through unionization were sufficient to offset any union dues. Therriault also stated that if the union came in, the senior driver would get the better work, if that driver wanted it, and that McKay who was relatively less senior 'could come up short.' The trial examiner found that the questioning was limited and that Therriault, by assuring McKay that he did not have to answer his question, 'blunted what otherwise might have been the coercive nature of the inquiry.'[4] The trial examiner further found that statements relating to the adverse effects of a union seniority system were permissible predictions with a reasonable basis in fact and thus were legally protected speech under § 8(c) of the National Labor Relations Act.[5]
 
 
 4
 We begin our analysis with a brief discussion of the nature of the § 8(a)(1) offense of 'coercive interrogation'. The policy of § 8(a)(1) is to protect employee free choice in the decision whether to accept union representation,[6] a free choice explicitly preserved in § 7 of the NLRA[7] and implicit in a number of related areas of national labor policy. The specific focus of § 8(a)(1) is the prohibition of the use of employer economic power to interfere with this free choice.[8] But neither § 8(a)(1) or its union counterpart, § 8(b)(1), could reasonably be read to eliminate employer and union attempts to persuade workers of the benefits or costs of accepting the union. First, such a result would lead to the absurd conclusion that free choice means a relatively uninformed choice and, second, the result would be inconsistent with § 8(c) of the Act which implements traditional First Amendment policies.[9] The burden of § 8(a)(1) is thus to distinguish between employer attempts to persuade workers of the disadvantages of unionization and employer attempts to use their economic power to 'coerce' workers into voting against the union. But, as should be immediately obvious, there is no clear cut distinction between these two kinds of activity. There is always an iron 'fist inside the velvet glove'[10] of persuasion. Established First Amendment doctrine would seem to indicate that this inability to easily distinguish protected from non-protected speech is cause for restricting the government's ability to remedy the non-protected speech,[11] but the Supreme Court has expressly rejected that analogy.[12] It is thus the task of the Labor Board in the first instance and this Court on appeal to 'judge the impact of utterances made in the context of the employer-employee relationship.'[13]
 
 
 5
 The Board has since the inception of the National Labor Relations Act recognized that interrogation by an employer of a worker's attitude toward the union and that statements by the employer about what might happen if the union is selected as the representative of the employees have a tendency to coerce workers in the exercise of their § 7 rights.[14] The Labor Board and the courts have over the years crystallized a number of 'factors' to be considered in determining whether employer questioning and predictions as to the consequences of unionization pass beyond permissible persuasion into impermissible use of employer economic power. A number of these factors were enunciated in the leading case of Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964) and other factors were suggested in a subsequent case in the Fifth Circuit.[15] Virtually every Circuit Court of Appeals has adopted, explicitly or implicitly, the Bourne factors[16] and we think that these factors supply the proper starting place[17] for judicial and administrative analysis of whether particular employer questioning was in the totality of circumstances 'coercive' or merely persuasive. Passing from the coercive nature vel non of questioning about an employee's attitude toward a union to employer statements as to the effect of unionization, the recent decision in NLRB v. Gissel Packing Co., 395 U.S. 575, 616--620, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969) establishes that such statements must be either non-coercive or a prediction 'carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control . . ..'[18] Whether statements as to the effect of unionization are coercive involves an inquiry essentially similar to that suggested in Bourne.[19]
 
 
 6
 It is apparent from even a cursory reading of the trial examiner's decision in this case, adopted without opinion by the Labor Board, that the type of inquiry mandated by Bourne and related cases was not conducted here. The trial examiner properly considered the extent of the questioning by Therriault. Surely, an isolated and limited set of questions would not rise to the level of employer 'coercion'.[20] However, the trial examiner did not stop there but also stated that Therriault 'by assuring McKay that he need not answer unless he wanted to . . . blunted what otherwise might have been the coercive nature of the inquiry.' We find this conclusion highly problematic. Without a supporting discussion of the totality of circumstances surrounding the questioning, we are not prepared to hold that the bare 'assurance' that the employee need not answer is sufficient to eliminate what would otherwise be employer economic coercion. We think the Board should conduct a more searching inquiry into the nature of the questioning and the circumstances in which it was conducted before concluding the questioning was not coercive. As to Therriault's prediction that McKay might 'come up short' because of union seniority provisions, we are not prepared to evaluate this statement under the Gissel test until the Board has more fully considered whether the circumstances of the questioning were coercive. We also note that there was no evidence in the record to support the trial examiner's conclusion that Therriault had a reasonable basis in fact for his suggestion that the union might bring in a seniority system which would disadvantage McKay.[21] We thus think that the better course of action at this stage is to remand the case to the Board for a more complete evaluation of Therriault's questioning of McKay in light of the discussion in this opinion. This remand is consistent with the holding in Gissel that the Labor Board must in the first instance perform the extremely delicate task to distinguishing employer coercion from employer persuasion.[22]
 
 
 7
 A consideration of the vagaries of this task compels us to suggest to the Board the beginnings of principled approach to distinguishing coercion from persuasion. This approach, it would seem, is also instructive on the similarly delicate issue of whether a statement is a 'prediction' or a 'threat of retaliation.' A § 8(a)(1) violation based on speech alone is made out solely by reference to imminent coercive actions. Speech which carries a message of actual coercion is more than pure speech and thus is subject to balance with other important social interests. The Congress has concluded that the right of workers to freely associate for their economic betterment is of more social importance than the employer's free speech rights when that speech is backed by a threat of action. The Supreme Court has let that judgment stand.[23] But coercion must surely be interpreted to mean more than a persuasive argument that certain events will occur which are distasteful to the listener.[24] Rather coercion is defined by reference to the will of the speaker--does the speaker intend to perform an act for no other reason than that the listener is in favor of the union?[25] Of course, the speaker's intent must be inferred from the circumstances as they appear to the reasonable person. Thus, to take examples from a recurrent § 8(a)(1) problem, employer assertions that 'serious harm' will result from unionization are generally not an unfair labor practice while assertions that the employer will 'bargain from scratch' are unfair labor practices.[26]
 
 II. The Discharge of Ronald Hall
 
 8
 We next turn to the alleged § 8(a)(1) and (3) violation by the discharge of Ronald Hall. The trial examiner found that the General Counsel had not proven by a preponderance of the evidence that Therriault knew of Hall's union activities when he fired Hall and that, therefore, the discharge could not have been motivated by Hall's union activities.[27] The trial examiner recognized that the Board's 'small plant doctrine' permits an inference that the company knew of the union activities of specific employees from evidence that union activities 'were carried on in such a manner, or at times that in the normal course of events, (the Company) must have noticed them.'[28] However, the examiner felt that any inference arising from the 'small plant doctrine' in this case was overcome by Therriault's denials that he had knowledge of Hall's activities. The Board in its brief on this appeal has apparently abandoned this argument in favor of the position that Hall's activities were not conducted in such a manner that the Company must have noticed them. The trial examiner also found that other circumstantial evidence introduced by the general counsel was not sufficient to establish Therriault's knowledge of Hall's activities. Since the trial examiner concluded that Therriault did not know of Hall's union activities, he did not decide whether Hall's discharge was based on good cause.
 
 
 9
 We need not decide here whether the 'small plant doctrine' permits or compels an inference of employer knowledge absent evidence--as opposed to conclusory denials--to the contrary.[29] The overwhelming weight of the circumstantial[30] evidence in this record requires a finding that no substantial evidence exists to support the position that Therriault did not know of Hall's activities. We first note that Therriault need not have been morally certain that Hall was engaged in union activities in order for a finding of discriminatory discharge to be permissible. It is enough that he had a reasonable suspicion that Hall was the 'culprit' and was therefore willing to take action upon that suspicion.[31] Second, whether or not the 'small plant doctrine' compels any inferences, clearly the fact that only six[32] employees were involved in the relevant bargaining unit is some circumstantial evidence that any union activities would come to the attention of the Vice-President of Operations of the unit, in this case our Mr. Therriault. This circumstantial evidence is buttressed by fact that an employee of Law Warehouses and an employee of Bulk Haulers whom Hall had not directly spoken to were aware of Hall's activities. Furthermore, the 'small plant doctrine' suggests that the nature of the union activities is relevant circumstantial evidence.[33] Here Hall spoke with workers on the company premises--in particular, the terminal building. The trial examiner so found. These activities were carried on for approximately two months prior to Hall's discharge. Furthermore, Hall had brought himself to the attention of the Bulk Haulers management by several complaints and was admittedly known by the management as the only union member among the Bulk Haulers drivers. The very persuasive nature of this evidence is made legally compelling by Therriault's admissions that (1) he knew the union would attempt to organize the company (an admission made to Stephen McKay); (2) he and the Company were opposed to unionization and (3) he questioned his employees about whether they had been approached by the union 'every time that I talked to them, practically. . . .'[34] Therriault's testimony on why he did not ask Hall himself whether Hall had been approached by the union was dissembling to the point of disbelief.[35] We further note that the timing of Hall's discharge is highly suspect. Hall was discharged shortly after Therriault had questioned Stephen McKay. We refrain from commenting on the validity of the reason offered to support Hall's discharge, but we do note that Therriault's version of one particular event leading up to the discharge was not credited by the trial examiner.[36] We finally note that Hall was the spearhead of the unionization effort at Bulk Haulers and it is well known that discharge of a leading union adherent is a classis method of combatting unionization.[37] We would be very hesitant to give significant weight to Therriault's conclusory denial of knowledge of Hall's activities, but in this case we do not think it should be given any weight at all since Therriault's testimony was less than candid, to say the least.[38]
 
 
 10
 Against these facts, the trial examiner's conclusion that Therriault did not know or reasonably suspect Hall was attempting to organize his employees is nothing short of incredible and is so devoid of evidentiary support that we must refuse to accept it as a rational conclusion. We thus reverse the Board's acceptance of the trial examiner's decision. However, we are not prepared to hold at this time that Hall's discharge violated § 8(a)(3) or (1). The trial examiner's determination that Therriault did not know of Hall's union activities made it unnecessary for him to consider whether Hall's discharge was motivated by legitimate business reasons or by animosity to the union. We would be very hesitant to find a § 8(a)(3) violation simply of the basis of employer knowledge of union activities and employer opposition to unionization.[39] There is, of course, more evidence than this in the record to support a § 8(a)(3) charge but we think that evaluation of this evidence is a task for the Labor Board in the first instance. We, therefore, remand the case for such an evaluation.
 
 
 11
 In sum, we reverse the Board's determination that Therriault did not violate § 8(a)(1) by questioning Stephen McKay and remand for further consideration in light of Part I of our opinion. We also reverse the Board's determination that Therriault did not know of Hall's union activities and thus could not have discharged him in violation of § 8(a)(1) and (3) and remand for a finding of whether Hall's discharge was motivated by his union activities.
 
 
 12
 So ordered.
 
 
 
 [1]
 29 U.S.C. § 158(a)(1) (1970)
 
 
 [2]
 Id.; 29 U.S.C. § 158(a)(3) (1970)
 
 
 [3]
 Bulk Haulers, Inc., 201 N.L.R.B. No. 61 (1972)
 
 
 [4]
 Id., reprinted in Joint App. at 154
 
 
 [5]
 Id. citing § 8(c), 29 U.S.C. § 158(c) (1970)
 
 
 [6]
 NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964)
 
 
 [7]
 29 U.S.C. § 157 (1970)
 
 
 [8]
 See NLRB v. Exchange Parts Co., 375 U.S. 405, 409--410, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); Thomas v. Collins, 323 U.S. 516, 547, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (Jackson, J., concurring); NLRB v. Virginia Elec. & Power Co., 314 U.S. 469, 477--479, 62 S.Ct. 344, 86 L.Ed. 348 (1941)
 
 
 [9]
 See NLRB v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)
 
 
 [10]
 NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964)
 
 
 [11]
 Cf. Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150--151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). See also Blount v. Rizzi, 400 U.S. 410, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971)
 
 
 [12]
 NLRB v. Gissel Packing Co., 395 U.S. 575, 620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969)
 
 
 [13]
 Id
 
 
 [14]
 See NLRB v. Virginia Elec. & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941); Blue Flash Express, Inc., 109 N.L.R.B. 591 (1954); Standard-Coosa-Thatcher Co., 85 N.L.R.B. 1358 (1949)
 
 
 [15]
 NLRB v. Camco, Inc., 340 F.2d 803, 804--805 (5th Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). See NLRB v. Dorn's Transportation Co., 405 F.2d 706, 713--714 (2d Cir. 1969)
 The original Bourne factors are as follows:
 (1) The background, i.e. is there a history of employer hostility and discrimination?
 (2) The nature of the information sought, e.g. did the interrogator appear to be seeking information on which to base taking action against individual employees?
 (3) The identity of the questioner, i.e. how high was he in the company hierarchy?
 (4) Place and method of interrogation, e.g. was employee called from work to the boss's office? Was there an atmosphere of 'unnatural formality'?
 (5) Truthfulness of the reply. 332 F.2d at 48.
 
 
 [16]
 See Utrad Corp. v. NLRB, 454 F.2d 520, 524--525 (7th Cir. 1972); NLRB v. Consol. Diesel Elec. Co., 469 F.2d 1016, 1020 n. 9 (4th Cir. 1972); Corriveau & Rothier Cement Block, Inc. v. NLRB, 410 F.2d 347, 349 (1st Cir. 1969); NLRB v. Hotel Conquistador, 398 F.2d 430, 434 (9th Cir. 1969); Jervis Corp. v. NLRB, 387 F.2d 107, 111 n. 3 (6th Cir. 1967); NLRB v. Ritchie Mfg. Co., 354 F.2d 90, 99 (8th Cir. 1966); NLRB v. Camco, Inc., 340 F.2d 803, 804--805 (5th Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). See also the reasoning in National Can Corp. v. NLRB, 374 F.2d 796, 804--807 (7th Cir. 1967)
 
 
 [17]
 There is nothing in Local 49, Operating Eng'rs v. NLRB, 122 U.S.App.D.C. 314, 353 F.2d 852, 856 (1965), on remand Struksnes Construction Co., 165 N.L.R.B. No. 102 (1967) approved NLRB v. Gissel Packing Co., 395 U.S. 575, 609, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), which is inconsistent with Bourne. The Struksnes case concerned an employer poll of his employees to determine majority sentiment. This Court refused to accept the Board's position based on its loss in NLRB v. Lorben Corp., 345 F.2d 346 (2d Cir. 1965) that an employer poll was not a violation of § 8(a)(1) simply because the employer did not inform the employees of the purpose of the poll and assure them that there would be no retaliation. This Court remanded the case to the Board to develop specific standards to govern employer polls. The Supreme Court approved the Board's remand effort apparently as a 'safe harbor' for the employer who, under prior Board authorization card practice, might be between the devil and the deep blue sea when deciding whether to recognize an authorization card proffer. NLRB v. Gissel Packing Co., supra at 609, 89 S.Ct. 1918. The need for this safe harbor is considerably lessened by the Board's new practice on authorization cards announced at oral argument in Gissel, 395 U.S. at 594, 89 S.Ct. 1918, and is eliminated altogether by the Board's most recent shift in authorization card policy rejected by this Court. See Local 413, Truck Drivers v. NLRB, 159 U.S.App.D.C. 228, 487 F.2d 1099 (1973), cert. granted sub nom. Linden Lumber Div. v. NLRB, 416 U.S. 955, 94 S.Ct. 1967, 40 L.Ed.2d 305 (1974). In any event, we do not think that the specific holding in Struksnes can overcome the weight of § 8(a)(1) precedent recognized in the reasoning of Gissel. Cf. NLRB v. Rubin, 424 F.2d 748, 751 (2d Cir. 1970); NLRB v. Dorn's Transportation Co., 405 F.2d 706, 713--714 (2d Cir. 1969); General Mercantile & Hardware Co. v. NLRB, 461 F.2d 952, 954 (8th Cir. 1972)
 
 
 [18]
 The relation between this 'test' under § 8(a)(1) and the general Bourne analysis of coercive circumstances is not clear from the decided cases which variously merge the two and treat each as an independent ground for refusing to find a § 8(a)(1) violation. One possible view is that this specific Gissel test quoted in the text is a per se rule for determining whether one particular statement (as opposed to a set of coercive circumstances) is coercive. See pp. 495--496 infra
 
 
 [19]
 See generally Louisburg Sportswear Co. v. NLRB, 462 F.2d 380, 385--386 (4th Cir. 1972); J. P. Stevens & Co. v. NLRB, 449 F.2d 595 (4th Cir. 1971); Central Hardware Co. v. NLRB, 439 F.2d 1321, 1328--1329 (8th Cir. 1971); NLRB v. Lenkurt Elec. Co., 438 F.2d 1102 (9th Cir. 1971); Automation & Measurement Div. v. NLRB, 400 F.2d 141 (6th Cir. 1968); cases cited note 26 infra
 
 
 [20]
 Cf. NLRB v. General Stencils, Inc. v. NLRB, 472 F.2d 170 (2d Cir. 1972); St. Louis Car Div. v. NLRB, 439 F.2d 1145, 1148 (8th Cir. 1971); NLRB v. Consol. Diesel Elec. Co., 469 F.2d 1016, 1020--1021 (4th Cir. 1972)
 
 
 [21]
 See International Union Electrical Workers v. NLRB, 110 U.S.App.D.C. 91, 289 F.2d 757, 763 (1960)
 
 
 [22]
 395 U.S. at 620, 89 S.Ct. 1918
 
 
 [23]
 NLRB v. Gissel Packing Co., 395 U.S. 575, 616--620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); see Thomas v. Collins, 323 U.S. 516, 547, 65 S.Ct. 557, 89 L.Ed. 630 (1945) (Jackson J., concurring)
 
 
 [24]
 Cf. Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Feiner v. New York, 340 U.S. 315, 321--331, 71 S.Ct. 303, 95 L.Ed. 295 (1951) (Black and Douglas, JJ., dissenting); Terminiello v. City of Chicago, 337 U.S. 1, 69 S.Ct. 894, 93 L.Ed. 1740 (1949). Compare these cases with the 'fighting words' doctrine of Chaplinsky v. New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1699 (1942)
 
 
 [25]
 When the employer declares that he will have to move or close down if the union comes in and obtains higher wages, union organizers can reply that their negotiators will take account of the company's position and endeavor not to induce its departure from the area. Under these circumstances, the arguments on both sides are legitimate and the voters are free to choose between them. But if the employees are led to believe that the company will simply close down automatically if the union is selected, they are left with a devastating and improper assertion which the organizer is unable to rebut save by pointing out that the employer cannot carry out his plan without violating the law. Rightly or wrongly, this is an argument that will often make little or no impression on the voters
 Bok, The Regulation of Campaign Tactics in Representation Elections Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 77 (1964). This view of the § 8(a)(1) principle, when applied to employer speech, was adopted in Luxuray of New York v. NLRB, 447 F.2d 112, 117 (2d Cir. 1971) and is implied in NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969) ('If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a reasonable prediction . . ..').
 Viewed in this context, § 8(a)(1) pure speech violations are really an inchoate form of actions which if completed would violate § 8(a)(1) or (3) under established doctrine.
 
 
 [26]
 See NLRB v. Saunders Leasing System, Inc., 497 F.2d 453, 456--457 (8th Cir. 1974); E. I. Du Pont de Nemours & Co. v. NLRB, 480 F.2d 1245, 1247 (4th Cir. 1973); NLRB v. Holly Farms Poultry Indus., Inc., 470 F.2d 983, 985 (4th Cir. 1972); NLRB v. Erie Marine, Inc., 465 F.2d 104, 106 (3d Cir. 1972); NLRB v. Aerovax Corp., 435 F.2d 1208 (4th Cir. 1970). See also the 'propaganda movie' cases: Luxuray of New York v. NLRB, 447 F.2d 112, 117 (2d Cir. 1971); Kellwood Co. v. NLRB, 434 F.2d 1069 (8th Cir. 1970); Southwire Co. v. NLRB, 383 F.2d 235 (5th Cir. 1967)
 
 
 [27]
 We have, of course, no dispute with the proposition that the employer must be aware of the employee's union activities in order to discharge that employee on the basis of those activities. See Local 728, Teamsters v. NLRB, 131 U.S.App.D.C. 195, 403 F.2d 921, 923 (1968), cert. denied, 397 U.S. 935, 89 S.Ct. 296, 21 L.Ed.2d 272 (1970); General Mercantile & Hardware Co. v. NLRB, 461 F.2d 952, 955 (8th Cir. 1972); NLRB v. Lexington Chair Co., 361 F.2d 283, 291 (4th Cir. 1966)
 
 
 [28]
 Hadley Mfg. Co., 108 N.L.R.B. 1641, 1650 (1954). See Famet, Inc. v. NLRB, 490 F.2d 293, 295--296 (9th Cir. 1973); NLRB v. Buddies Supermarkets, Inc., 481 F.2d 714, 722 (5th Cir. 1973); NLRB v. Mid State Sportswear, Inc., 412 F.2d 537, 539--540 (5th Cir. 1969); NLRB v. Joseph Antell, Inc., 358 F.2d 880, 882 (1st Cir. 1966)
 
 
 [29]
 See NLRB v. Buddies Supermarkets, Inc., 481 F.2d 714, 722 (5th Cir. 1973)
 
 
 [30]
 A finding of employer knowledge may clearly be established on the basis of circumstantial evidence. See NLRB v. Wal-Mart Stores, Inc., 488 F.2d 114, 116--117 (8th Cir. 1973); Famet, Inc. v. NLRB, 490 F.2d 293, 295 (9th Cir. 1973); NLRB v. Long Island Airport Limousine Service Corp., 468 F.2d 292, 295 (2d Cir. 1972); Texas Alum. Co. v. NLRB, 435 F.2d 917, 919 (5th Cir. 1970). Anything to the contrary in Amyx Indus. Inc. v. NLRB, 457 F.2d 904 (8th Cir. 1972) must, therefore, be disapproved
 
 
 [31]
 See NLRB v. Clinton Packing Co., 468 F.2d 953, 955 (8th Cir. 1972)
 
 
 [32]
 The trial examiner apparently felt that the employees of Law Motor Freight, Bulk Haulers and Law Warehouses should be combined for purposes of applying the 'small plant doctrine.' The doctrine would still be applicable if that is done in this case, but that addition is manifestly unreasonable since 90% of the total employees of these three companies worked for Law Motor Freight which was already unionized. Therefore, such employees would not be a subject of concern to a management attempting to prevent further unionization of another company. Bulk Haulers itself had, as indicated in the text, only six non-supervisory employees
 
 
 [33]
 That is, if the union activities were such that the activities would naturally come to the attention of the management, then an inference of employer knowledge is reasonable. See NLRB v. Joseph Antell, Inc., 358 F.2d 880, 882 (1st Cir. 1966). Cf. Texas Alum. Co. v. NLRB, 435 F.2d 917, 919 (5th Cir. 1970)
 
 
 [34]
 Hearing Tr. at 496, reprinted in Joint App. at 132--33
 
 
 [35]
 Hearing Tr. at 496--99, reprinted in Joint App. at 132--36
 In particular, Therriault at first stated that he spoke with all his employees about the union, then stated that he not spoken to Hall about the union (if he had, the inference of knowledge would have been irresistable) and finally explained Hall's exclusion from questioning because he, Therriault assumed all union members had to vote for the union. This explanation is inconsistent with testimony that he, Therriault, knew that Hall joined the union pursuant to a union security agreement at Law Motor Freight and thus Hall's union membership was not probative of his support of the union. Hearing Tr. at 487, reprinted in Joint App. at 127.
 
 
 [36]
 Therriault testified that the reason for Hall's discharge was his late deliveries. The alleged 'last straw' was Hall's late departure on December 6, 1971. Therriault testified that Charles McKay, Hall's supervisor, received a complaint about Hall's alleged late delivery on the 6th. McKay denied this statement and the delivery papers Hall returned indicated that he had arrived on time. The trial examiner did not credit Therriault's version
 
 
 [37]
 See John Klann Moving & Trucking Co. v. NLRB, 411 F.2d 261, 262--263 (6th Cir. 1969); NLRB v. Longhorn Transfer Service, Inc., 346 F.2d 1003, 1006 (5th Cir. 1965). See also NLRB v. Long Island Airport Limousine Service Corp., 468 F.2d 292, 295 (2d Cir. 1972)
 
 
 [38]
 See notes 35--36 supra
 
 
 [39]
 NLRB v. Speed Queen, 469 F.2d 189, 194 (8th Cir. 1972)