DELCHAMPS, INC., Petitioner-Cross Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.

No. 78–1176.

United States Court of Appeals, Fifth Circuit.

Jan. 25, 1979.

Kullman, Lang, Inman & Bee, William F. Banta, New Orleans, La., for petitioner-cross respondent.

John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Allison W. Brown, Jr., Frederick Havard, Attys., Elliott Moore, Deputy Assoc. Gen. Counsel, N. L. R. B., Washington, D. C., Lee J. Romero, Jr., N. L. R. B., New Orleans, La., David Johnson, George C. Longshore, Birmingham, Ala., for respondent-cross petitioner.

Charles M. Paschal, Regional Director, Region 15, N. L. R. B., New Orleans, La., for other interested party.

Before GEWIN, COLEMAN, and GOLDBERG, Circuit Judges.

COLEMAN, Circuit Judge.

I.

This case is before the Court on a petition for the review of an adverse order of the National Labor Relations Board (Board)[1]

---

1. Delchamps, Inc. and Retail Clerks Union, Local No. 1657, 234 NLRB 47 (January 16, 1978).

filed by Delchamps, Inc. (Delchamps). The Board has filed a cross-application for enforcement of its order. Jurisdiction is conferred by §§ 10(e) and 10(f) of the National Labor Relations Act, *as amended*, 29 U.S.C. § 160(e)–160(f) (Act).

We decline enforcement of the Board order.

## II.

Delchamps operates 44 retail grocery stores in Alabama, Florida, Louisiana, and Mississippi, employing approximately 1600 persons. Fifteen stores, providing jobs for 500 persons, are located in the Mobile-Baldwin County area of Alabama.

Sometime in July or August, 1976, the Retail Clerks Union, Local No. 657 (Union) commenced a campaign to organize Delchamps' employees in the Mobile-Baldwin area. The employer became aware of this activity shortly after it began. On August 12 and 13, 1976, Joel Swanson, Delchamps' Vice-President and Secretary, delivered a prepared anti-union speech at the various Mobile-Baldwin area stores. The employees were told:

> Anything you've gotten in the past in wages and benefits has come from the company. The union doesn't sign your paycheck.

The speech said nothing about pay raises and none were instituted during the next three months.

In early August, 1976, Delchamps had initiated a survey of the wages paid by its competitors. On November 28, 1976, based on this wage survey, wages were raised across the board at all 44 stores. While the increase went to all stores, only fifteen stores were involved in the unionization effort.

On December 1, 1976, the Union filed a charge with the Board alleging that Delchamps violated § 8(a)(1) of the Act by, among other things, granting the November 28 wage increase.

The Administrative Law Judge concluded, as a matter of law, that the General Counsel for the Board had not established, by a preponderance of the evidence, that Delchamps had violated the Act and, accordingly, dismissed the complaint.

The Board reversed that decision. It concluded that a sufficient nexus between the wage increase and the union organizational campaign was established, "particularly in light of the union animus demonstrated by the Respondent's commission of unfair labor practices at" one store (in Fairhope, Alabama).[2] The Board found that the burden shifted to Delchamps to produce evidence that the wage increase was unrelated to the presence of union activity and held that Delchamps had failed to produce such evidence.

## III.

■ We must affirm a Board decision if it is supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 29 U.S.C. § 160(e)–160(f). We conclude, however, that the General Counsel did not satisfy the applicable burden of proof; that the Board relied on suspicious circumstances "in the face of positive testimony given by reputable and unimpeached witnesses", *NLRB v. Crosby Chemicals, Inc.*, 5 Cir. 1960, 274 F.2d 72, 74 n. 5, 78.

Section 8(a)(1) of the Act provides that "It shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7 of the Act]." 29 U.S.C. § 158(a)(1). Section 7 provides that employees "shall have the right to

---

2. In *Delchamps, Inc. v. NLRB*, 5 Cir. 1978, 585 F.2d 91 we held that there was substantial evidence that Delchamps committed unfair labor practices at its Fairhope, Alabama store—one of the stores within the Mobile-Baldwin area—in the summer of 1976 by creating the impression of employer surveillance of employees' union activities and by threatening economic reprisals. However we denied enforcement of the Board order to the extent it was based on the discharge of an employee where the evidence did not show such discharge was made for engaging in protected activities.

self-organization, to form, join, or assist labor organizations . . .". 29 U.S.C. § 157.

■ The Act does not attempt to restrict the gratuitous conferral of economic benefits by a non-union employer on its employees. *See NLRB v. Exchange Parts Co.*, 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *NLRB v. WKRG–TV, Inc.*, 5 Cir. 1973, 470 F.2d 1302, 1307–1308.

■ Although ordinary attempts by an employer to stay ahead of unionization are entirely proper, the Act comes into play where the situation has sufficiently crystallized so that some specific orientation exists. It has long been recognized that the inherent danger in "well-timed increases in benefits is the suggestion of a fist inside the velvet glove." *NLRB v. Exchange Parts Co., supra.* Thus the conferral of economic benefits upon the employees "which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect" is as much a § 8(a)(1) violation as are "intrusive threats and promises". *NLRB v. Exchange Parts Co., supra.*

In determining whether a velvet-glove violation exists courts have looked at a number of factors, such as whether the employer has manifested an anti-union animus, the timing of the wage increase, the employer's knowledge of union activity, and the relation of the wage increase to past practices. *See generally Russell-Newman Manufacturing Co. v. NLRB*, 5 Cir. 1969, 407 F.2d 247, 252.

The Board contends that there was more than sufficient evidence on which to bottom its finding of a § 8(a)(1) violation. First, the Board correctly observes that we recently have had occasion to enforce a Board order concerning unfair labor practices committed by Delchamps at one of the Mobile-Baldwin stores.[3] Moreover, Delchamps delivered an undisputably legal but nonetheless anti-union speech in August 1976, shortly after it learned of the union

activity. Included in the speech was a reminder to the employees of the fact that Delchamps, and not the union, provides the economic benefits.

The difficulty with the Board position is that the speech occurred during August, whereas the wage increase was neither announced nor implemented until November, three months later. No raise in pay was mentioned in the speech. There was no other evidence presented tending to connect the speech with the raise. There was only one anti-union speech; the unfair labor practices occurred at only one of the *many* Baldwin stores.

■ The Board also contends that the initial decision to increase wages was made about the time Delchamps learned of the union activity, but a wage increase made during a union organizational campaign is not forbidden unless it is granted for the purpose of restraining employees in the free exercise of their right of choice of whether to unionize. *Louisburg Sportswear Co. v. NLRB*, 4 Cir. 1972, 462 F.2d 380, 384. According to the testimony of Delchamps' vice-president and secretary, Joel O. Swanson, the actual decision as to when to implement a wage increase and how much of an increase to grant was not made until shortly before the increase was actually granted. On the other hand, Swanson did acknowledge that a decision to work on a new wage plan, which ultimately culminated in the November raise, was made in August. This, Swanson further testified, was consistent with the established company policy of working on a new wage plan after implementing another. The Board responds to this by claiming that Delchamps did not have an established compensation policy, and, even if it did, the November increase was not consistent with such a policy. The facts are that prior to 1973 Delchamps gave raises on an individual basis under a merit system, but after 1973 Delchamps instituted a compensation system based on the wages paid by its major competitors. Wage increases were given at all Delchamps stores

**3.** *See* note 2.

on May 13, 1973; April 28 and October 20, 1974; June 29, 1975; March 14 and July 4, 1976; and November 28, 1976. The raises in March and July 1976 were part of a two-step raise announced in March 1976.

The Administrative Law Judge found that there was "nothing disparate in the timing of the November 28, 1976 raise, or any departure from past practice". He noted that the rate of increase was generally higher in November than in the three preceding increase periods,[4] but found, based on the records of increases and the undisputed and credible testimony of Swanson, that the November 28 increase was justified.

The Board concluded that the timing of the wage increases was "at best erratic" and that the November increase was inconsistent with previous increases.

■ The timing on the previous pay raises had not been evenly spaced but they had been occurring frequently—no doubt occasioned by the inflation then rapidly emerging which required the employer to raise the pay or see the employee go to work for an establishment that had increased its pay scale. In any event, as we appraise this record, a pronounced pattern of pay raises had already emerged by July 1, 1976, and the timing of the November increase is consistent with that pattern. The disparity in the increased rate is, at best, of questionable significance. Delchamps' wage increases were based on its competitors' wages and not on wages it had previously granted. Although no evidence was presented as to exactly what the competitive rate actually was, Swanson did testify that the increase was required to stay competitive.[5] Of course, Delchamps did not have to pay at exactly the same rate as its competition but it can hardly be argued with a reasonable expectation of acceptance that it did not have to stay somewhere near the ball park.

We can perceive no rational basis for the Board's denial of credibility to Swanson's testimony. His testimony was undisputed. It was not inherently unreasonable. Presumably, in its far-flung acquaintance with wages ordinarily paid in a given activity, to say nothing of its ability to receive and gather evidence for hearings before an administrative law judge, there would have been no problem about offering contradictory testimony if it existed. The Board simply eliminated Swanson's testimony by the mere act of declaring it incredible in the face of a finding of credibility by the judge who had heard the testimony, viewed the witness, observed his demeanor, and witnessed his cross-examination.

■ The Board could take this action only if Swanson's undisputed testimony conflicted with well supported or obvious inferences from the remainder of the record, *Russell-Newman Manufacturing Co. v. NLRB, supra,* at 249; *NLRB v. Camco, Inc.,* 5 'Cir. 1965, 340 F.2d 803, 809; *NLRB v. Pyne Molding Corp.,* 2 Cir. 1955, 226 F.2d 818, 819. No such inferences exist here. Indeed, it must be observed that Swanson's testimony is supported by the fact that

4. The May 1973 and April 1974 increases were eliminated from consideration by the ALJ because the former was the first of the new plan and the latter occurred at the end of the federal wage and price control period.

5. The Board concluded that Delchamps' failure to produce the chart it had prepared of competitors' wages warranted an inference that such chart would have been damaging to Delchamps' case, under the authority of *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). We disagree. *Interstate Circuit, Inc.* involved an attempt by film distributors to rebut the government's evidence of concerted action by the testimony of their local managers. The Court observed that the distributors failed to call those officers with the authority to act for the distributors and thus be in a position to know whether concerted action had been taken. Thus it was held that the "production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse." *Id.* at 226, 59 S.Ct. at 474. In the case *sub judice* the evidence was not available because it had been destroyed after the November increase was granted. Moreover there is no indication that such destruction was done in bad faith. Swanson testified that such wage surveys were routinely destroyed after the increase was implemented.

·Delchamps granted wage increases to employees at *all 44 stores*, whereas only 15 stores were involved in a union organizational campaign. *See Louisburg Sportswear Co. v. NLRB, supra.*

Finally, the Board now tries to argue that Delchamps was aware of union activity going on at the time of the November increase. It is clear from examining the record, however, that Swanson, testifying on behalf of Delchamps, was admitting only a general awareness of union activity involving the Delchamps operation during November 1976. Indeed, Swanson testified to a continuous union organizational attempt over the past ten to fifteen years. Swanson, on the other hand, was not admitting an awareness of union activity at the Mobile-Baldwin area stores. To the contrary Swanson testified that there was no union organizing that he was aware of at these particular stores during November 1976. The ALJ found this testimony credible. Not only are there no contrary inferences but, more important, there is no evidence that, in fact, the union was actively engaged in an organizational campaign at the time of the increase.[6]

█ The Board's collection of suspicious activities may be sufficient to require Delchamps to come forward, as it has, with a legitimate business justification for the challenged wage increase. *See NLRB v. Gotham Industries, Inc.,* 1 Cir. 1969, 406 F.2d 1306, 1309 & n. 5, *cited in D'Youville Manor, Lowell, Mass. v. NLRB,* 1 Cir. 1975, 526 F.2d 3, 5. Such suspicious circumstances may not be substituted, however, for substantial evidence, *NLRB v. Crosby Chemicals, Inc., supra* at 78.

For lack of the requisite substantiality of evidence supporting the Board order, its enforcement is

DENIED.

**6.** There is no evidence in the record that there was union activity between August 1976 when such activity first began and December 20, 1976, approximately one month after the wage increase, when Delchamps received a letter from the "Organizing Committee" which had been signed by fifty Delchamps employees.

Delchamps was advised of the organizational efforts of some of its employees and cautioned against violating employee rights. On April 19, 1977 the Union filed a petition seeking to represent the employees at the Mobile-Baldwin area stores.