MGM GRAND HOTEL–RENO, INC., Petitioner in 80–7365, Cross-Petitioner in 80–7475,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent Cross-Petitioner in 80–7365,

Stationary Engineers Local 39, Intervenor.

Nos. 80–7365, 80–7475.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 8, 1981.

Decided Aug. 17, 1981.

Stacy D. Shartin, Seyfarth, Shaw, Fairweather & Geraldson, Los Angeles, Cal., for petitioner.

Richard Zuckerman, N.L.R.B., Washington, D.C., argued for respondent; Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., on brief.

Before MERRILL, ADAMS,* and SNEED, Circuit Judges.

ADAMS, Circuit Judge:

This case is before the Court on the petition of the MGM Grand Hotel, Reno, Nevada, hereinafter the "Hotel," to review an order of the NLRB issued against it on May 30, 1980.[1] The Board has filed a cross-application for enforcement of its order.

a.

The Hotel is a Nevada corporation engaged in the operation of a hotel and casino in Reno. It commenced business operations on May 3, 1978. All individuals hired by the Hotel received a copy of the employee's "Handbook" as well as a separate document entitled "General Rules." The Hotel's "no solicitation policy," as outlined in the Handbook, stated as follows:

Solicitation by anyone for funds, membership in organizations or clubs, or dis-

---

* Honorable Arlin M. Adams, United States Court of Appeals for the Third Circuit, sitting by designation.

1. Reported at 249 in NLRB # 153.

tribution of any literature for any purpose, is strictly forbidden on company property. The circulation of petitions of any kind is similarly forbidden. This includes employees and nonemployees.

The original "General Rules" also contained the following language: "Circulation of petitions of any kind for solicitation of employees for any purposes other than the United Way is not permitted." On May 6, the Hotel issued a revised set of General Rules to all current employees. These revised rules were distributed to employees hired thereafter. Although the employees' Handbook was revised after the Hotel opened, the original Handbook continued to be distributed to newly hired employees until the first part of August and the revised Handbook was not distributed until November.

On June 13, Andrew Csonka was hired by the Hotel's Maintenance Department as a "Welder-Engineer" at a rate of $52 for an eight-hour shift. Csonka's initial job was to examine new equipment and set up the welding shop. Thereafter, Csonka was the engineer primarily responsible for maintenance-type welding and fabrication, which occupied 90.95% of his working time.

In late June the Union began an organizing campaign among the Hotel's engineering employees. Csonka signed an authorization card and played an active role in assisting the Union, talking with several employees about unionization and distributing authorization cards. On August 18 the Union filed a petition with the NLRB seeking certification as an exclusive bargaining representative with the Hotel's Maintenance Department employees. During the period between the filing of this petition and the representative election, which was held on August 6, the Hotel conducted a number of meetings with Maintenance Department employees to discuss the upcoming election. Supervisors Williams and Kelly distributed anti-Union campaign literature and engaged in discussions with various Union members regarding the merits of the Union's cause. From that discussion Williams and Kelly evaluated each employee's probable adherence or lack thereof and reported the results to top-level management.

In the latter part of August supervisor Williams approached James Corbett, a maintenance engineer, and asked him "what . . . (he thought) of the Union." When Corbett replied that he did not know and had not thought about it, Williams stated, "You know, if the Union comes in here, you guys are going to probably have to take an examination to check to see your qualifications and . . . that's going to bring down a lot of changes, and a lot of people are going to be going out the door." About a week later, Williams called Corbett aside from a group of employees and asked him whether Charlie Green or any other employee had "been talking to (him) about the Union." Williams further asked whether Corbett had "been down to any of the Union meetings." Finally, during approximately the same period, when Williams encountered Corbett and another engineer on their way to a job, Williams asked Corbett "what . . . (they were) doing together." Corbett replied that they were "going to a job." Whereupon Williams stated, "Well, I am giving you fair warning. You guys aren't supposed to be caught together. Two guys together, that's no good." When Corbett repeated that they were merely on their way to a job, Williams replied, "if Administrative Director of Engineering Helmut (Herbrechtsmeier) catches you, you're going to hear about it."

About a month before the election the Hotel conducted a meeting for all day shift personnel in the Maintenance Department. At this meeting Williams instructed employees that they were not to "talk to each other . . . in between jobs." Further, upon completion of their jobs, employees were to return to the Engineering Department for another work order and then to proceed alone to their next assignment.

On September 10, Csonka spoke with supervisor Williams about the Union. During

the course of the conversation Csonka expressed an interest in going to school. Williams informed Csonka that the Hotel at times "catered to people who were going to school," but that "if the Union came in" there would be no chance of that happening in the future. Around September 21, Williams mentioned to Csonka that he (Williams) had been "jumped on by Herbrechtsmeier for permitting Csonka and another employee to walk "through the halls together on the way to their job." Williams warned Csonka that maintenance engineers should avoid contact even while "going to or from a (two-man) job" or even "to or from lunch."

During the same time period, prior to the election, Williams engaged in additional conversations concerning the Union with unit employees Paul Magrini and Thomas Hansen. Williams invited Magrini into the back of a pickup truck for a private discussion, and then asked whether Magrini was planning to vote for the Union. When Magrini stated that he "hadn't made up his mind," Williams suggested that perhaps Magrini "could better negotiate for himself, rather than with a Union." Similarly, Williams asked Hansen "what (he) thought about the Union," and stated that the Union would take (Hansen's) money. Williams also told Hansen "not to walk with anybody or talk to anybody about the Union."

At an assembly of Maintenance Department employees on October 2—four days before the election—the Hotel announced a substantial wage increase for the maintenance engineers and other employees in the bargaining unit. Concurrent with the wage adjustment, the Hotel established a new classification system which designated each maintenance engineer as either in Group I or Group II. For employees in Group I the new rate of pay ranged from $64–$76 for an 8 hour shift; for Group II engineers the wages per shift ranged from $50–$64. Twenty-three of the maintenance engineers in the bargaining unit were classified as Group I and received wage increases in varying amounts.

A secret ballot election was held on October 7, 1978, and the Union was defeated. After the election, at a meeting with Williams, Herbrechtsmeier and Engineering Manager James Sauder, Csonka was advised of his classification as a Group II maintenance engineer and that he would not be receiving a wage increase. When Csonka expressed his disagreement with this action by the Hotel and asked Sauder for an explanation, Sauder stated that to be in Group I an employee "has to know all different aspects of the engineering field" and "has to be able to handle" whatever work is required. Thus, as Sauder explained to Csonka, Group I engineers must be able to perform carpentry, upholstery, and boiler room work and to know how to paint and how to be a plumber. Csonka replied that in that case no one working at the Hotel "was qualified to be a Group I engineer." Csonka was then told that he would be given the opportunity to "go on different jobs . . . throughout the hotel" to broaden his experience. Following this meeting, Csonka had a conversation regarding his classification with his immediate supervisor Ralph Kelly. Kelly agreed that Csonka's classification should have been Group I.

Several months later, in mid-April 1979, Supervisor Bill Ferris informed Csonka "that he was working on moving Csonka up to a Group I engineer but . . . was having some problems." Ferris mentioned that "there was spot open on the swing shift," and that if Csonka took it he would be able to learn "different aspects of the engineering field" and "move up rapidly." Csonka accepted the swing shift position. On June 13, 1979, Csonka received his yearly evaluation and was granted a wage increase from $58 to $64 per 8-hour shift. He has never informed whether his raise carried with it an upgrade to the level of Group I engineer.

The Board found that the Hotel violated Section 8(a)(1) of the Act by (a) interrogating and threatening employees, (b) by suggesting that employees could negotiate

more favorably without the assistance of the Union, (c) by maintaining invalid rules prohibiting employee communication, and (d) by granting a wage increase so as to affect the election results. The Board also found that the Hotel violated Section 8(a)(3) and (1) of the Act by discriminating against Csonka because of his Union activities. The Board ordered the Hotel to cease and desist from unfair labor practices and from interfering in any other manner with the exercise of employees' rights under Section 7 of the Act. Affirmatively, the Board's order requires the Company to make Csonka whole for any loss of pay suffered as a result of any discrimination against him and to promote him retroactively with all attendant privileges and benefits, to the classification of Group I maintenance engineer. The Board's order also directs the Hotel to post appropriate notices.

b.

 The standard to be applied when reviewing findings of the NLRB is whether there is substantial evidence in the record to support the findings. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). On the basis of this standard, we conclude that there was sufficient evidence in the record to support the Board's findings in all respects except as to the wage increase. The decision to increase the wages was necessitated by economic factors, the most notable being the intense competition for qualified employees in the competitive Reno labor market. The Hotel's President, Barry Brunet, testified in detail concerning the need for the wage increase. As he explained, the Hotel's inauguration was followed by the opening of several other hotels and casinos in the area, causing a severe labor shortage. The labor market became "tighter" as the other hotels began operating and MGM had extreme competition for an effective labor force. In addition, the Hotel suffered heavy employee turnover.

Mr. Brunet's testimony was substantiated at all important points. Personnel Director Ostrovsky confirmed that the problem in recruiting and retaining qualified employees constituted a crisis situation in the months prior to the wage increase. On the basis of computer surveys and interviews with departing employees, Ostrovsky concluded that the Hotel's compensation system was unsatisfactory in two respects. First, the Hotel's merit system gave department managers great discretion in setting the wage rates of individual employees and resulted in substantial disparities between employees of different departments. Second, Ostrovsky concluded that the Hotel's wages were inadequate to attract and retain experienced and qualified employees. Although the hearing examiner believed that the Hotel had solved its problems with respect to attracting and retaining maintenance engineers and having a satisfactory and stable work crew at the time of the wage increase, the evidence was inconsistent with this conclusion. Herbrechtsmeier testified that in the months prior to the wage increase the Hotel had difficulty recruiting qualified maintenance personnel. The Hotel was the largest building in Reno and had the most sophisticated equipment. Consequently it required a large number of highly-skilled maintenance engineers. A sufficient number was unavailable locally and the high cost of housing deterred prospective employees from readily moving into the Reno area. Engineering Manager Sauder also corroborated Ostrovsky and Herbrechtsmeier on this point. He testified that the Hotel had a difficult time finding maintenance engineers who were experienced with respect to boilers, plant operation, commercial refrigeration and high voltage electricity.

 The ALJ placed great emphasis on a campaign leaflet that had been distributed during the course of the election campaign. It showed wages and benefits at the MGM Hotel in comparison with four other Reno employers. But it in no way purported to be a comprehensive survey. It did not compare the Hotel's wages and benefits with

similar employers whose maintenance employees may have been represented by other unions or by no union at all. Nor was there any indication in the record that the Hotel's wages were sufficiently high to attract qualified employees from the other establishments. The general rule is that where an increase in benefits results from a corporate-wide decision and is implemented corporate-wide in a normal business fashion, election results will not be set aside. *Northrop Telecomm, Inc.*, 233 NLRB 1104, 1105 (1977). Accord, *Delchamps, Inc. v. NLRB*, 588 F.2d 476 at 480–81 (5th Cir. 1979); *Louisburg Sportswear Co. v. NLRB*, 462 F.2d 380 at 384 (4th Cir. 1972).

Pre-election increases in wages have been considered lawful where the change serves to establish or maintain parity with wages provided to employees in other facilities of the employer. *See, e. g., Schulte's IGA Foodliner*, 241 NLRB 1332 (1979). Such corporate-wide increases have been held to indicate that the employer's conduct was not calculated to influence the impending election. Here the wage increase affected 1200 employees, only 49 of whom were in the bargaining unit in question. The increase resulted from a corporate-wide decision which was implemented in a normal business fashion. In no way did the ALJ dispute the evidence to this effect. The increase was based on a comprehensive study of the Hotel's wage rates and compensation policies that were instituted many months before the election.

Aware that the wage adjustments had potential legal ramifications with reference to the pending election, President Brunet discussed the situation with legal counsel. Ultimately the Hotel determined to do what it would do in the absence of an election— and granted the wage increase effective at the beginning of the next pay period after the final decision to give the increase had been made.

In short, a fair review of the evidence establishes that the wage increase resulted from a corporate-wide decision that was implemented in a normal business fashion. The Board failed to consider the evidence on the subject in its entirety, and therefore erroneously concluded that the wage increase of the bargaining unit employees was improper.

c.

The petition for review by the MGM Grand Hotel-Reno is denied except for that portion dealing with the wage increase. A judgment will be entered enforcing the Board's order aside from that portion of the order dealing with the wage increase.