UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 92-8572
_____

MARIO GARCIA,

Plaintiff-Appellee,

VERSUS

THE SECRETARY OF LABOR,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Western District of Texas

_____
(December 15, 1993)

Before KING and BARKSDALE, Circuit Judges, and DUPLANTIER,[1] District Judge.

BARKSDALE, Circuit Judge:

This appeal from the district court's reversing the decision by the Secretary of Labor that farm labor contractor Mario Garcia knowingly employed illegal aliens, in violation of 29 U.S.C. § 1816(a) (repealed 1986), turns on the Secretary's interpretation of that statute and the sufficiency of the evidence supporting that decision, which was contrary to that reached by the Administrative Law Judge. We **AFFIRM.**

_____

[1] District Judge of the Eastern District of Louisiana, sitting by designation.

I.

Garcia provided workers for several farm owners in the "Lower Valley" region of El Paso County, Texas.  In the spring of 1985, the Department of Labor began an investigation into his hiring practices.  As part of that investigation, it reviewed Border Patrol deportation records for August 1983 to May 1985.

Garcia's legal odyssey began almost eight years ago, in March 1986, when, as a result of the investigation, the Department, *inter alia*, assessed $119,275 in civil penalties.  At the subsequent hearing before the ALJ, the Department claimed that, in several respects, Garcia had violated the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801-1872.  Concerning the only issue before us, the ALJ concluded that Garcia had not knowingly employed illegal aliens in violation of § 1816(a) (repealed 1986).[2]

---

[2]     Because the ALJ found that the Department's position was not substantially justified, Garcia was awarded attorney's fees.  The ALJ found:

> The [Department] pursued the case in spite of the fact that it had almost no reliable evidence to support its position .... [It] pursued this action against [Garcia] for thousands of dollars although there was little legitimate basis in fact or law.

The violations found against Garcia by the ALJ included failures to keep required records and display a poster advising workers of their rights under the Act ($110 fine); the Secretary and district court affirmed.  The ALJ found for Garcia on the charge that he had employed a farm labor contractor without an appropriate certificate of registration; the Secretary reversed, imposing a $150 fine; the district court affirmed.  These rulings are not on appeal.  The Secretary also reversed the award of attorney's fees; that decision was not before the district court.

More than four years later,[3] the Secretary reversed this conclusion, assessed $118,800 in penalties ($400 for each of the 297 illegal aliens), and revoked Garcia's farm labor contractor certificate of registration.[4]  The Secretary's conclusion that Garcia knowingly employed illegal aliens was based on his failure to check documents prescribed by her.

Garcia appealed to the district court, which, *inter alia*, held for Garcia on the issue of knowingly employing illegal workers.[5] After carefully essaying the proper standard for review and recognizing the appropriate deference to be accorded the Secretary, it reversed for two reasons:  it found insubstantial evidence to support the Secretary's conclusion; and it held that the basis for that conclusion -- failure to check prescribed documents -- was the product of an impermissible construction of the statute.

---

[3]    It goes without saying that delay of this magnitude is of great concern.

[4]    When the decision was rendered in 1991, Lynn Martin was Secretary of Labor.

[5]    The Act permits any person against whom civil penalties have been imposed or whose farm labor contractor's certificate of registration has been revoked to seek review in district court, with appeal to circuit court.  *See* 29 U.S.C. §§ 1813(c), 1853(c).

The district court ruled on cross-motions for summary judgment.  Of course, the ruling was based on the undisputed administrative record, to which the district court's review is necessarily confined.  *See* 5 U.S.C. § 706; *see also* 29 U.S.C. §§ 1813(c), 1853(c) (referring to § 706(2)(E) for appropriate standard of judicial review).

II.

A.

The Secretary contends that the district court erred when it held that, as a matter of law, Garcia was not obligated by § 1816 to verify his workers' legal status in this country. That section provided in part:

> No farm labor contractor shall recruit, hire, employ, or use, *with knowledge*, the services of any individual who is an alien not lawfully admitted for permanent residence or who has not been authorized by the Attorney General to accept employment.

29 U.S.C. § 1816(a) (repealed 1986) (emphasis added). Section 1816(b) added the following:

> A farm labor contractor shall be considered to have complied with subsection (a) of this section if the farm labor contractor demonstrates that the farm labor contractor relied in good faith on documentation prescribed by the Secretary ....

29 U.S.C. § 1816(b) (repealed 1986). Pursuant to § 1816(b), the Secretary prescribed a number of documents. *See* 29 C.F.R. § 500.59 (repealed 1986).[6]

The Secretary maintains that § 1816 created an objective standard; that in a geographic area in which illegal workers are likely to be encountered, a failure to check documents should be deemed a proscribed knowing employment under § 1816(a). Accordingly, she asserts that the "Department need only establish

---

[6] Those documents included, *inter alia*: birth certificates, United States passports, certificates of citizenship, certificates of naturalization, United States identification cards issued by the INS, and consular reports of birth. 29 C.F.R. § 500.59 (repealed 1986).

the presence of illegal aliens in Garcia's workcrew in order for the burden to shift to Garcia to show that he relied in good faith on the prescribed documentation."  Because Garcia did not check the prescribed documents in the manner advocated by the Secretary,[7] she claims that he violated § 1816.

The deference we accord the Secretary's interpretation of a statute she is charged with administering is subject to the following well-known standard:

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress....  [I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984).  Accordingly, we do not defer to an interpretation which frustrates the clear intent of Congress.  *See Nicklos Drilling Co. v. Cowart*, 927 F.2d 828, 831-32 (5th Cir.

---

[7]     Garcia testified that he asked workers for a social security card or passport, and hired a worker if he possessed the former. The Secretary asserts correctly that a social security card *alone* would not fulfill the requirements of 29 C.F.R. § 500.59 (repealed 1986).  Still, the ALJ determined that Garcia, who lacks formal education and is not conversant in English, "constructively complied with this requirement to the extent that could be realistically expected."  The Secretary disagreed, finding "no basis for finding constructive compliance".  Because we hold that the Secretary's determination that § 1816(a) and § 500.59 placed an affirmative duty on farm labor contractors to check the prescribed documents is an impermissible interpretation of the statute and regulation, we need not reach the issue of constructive compliance.

1991) (en banc), *aff'd*, 112 S. Ct. 2589 (1992); *see also* **Chevron**, 467 U.S. at 843 n.9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

Insofar as the Secretary's interpretation of § 1816 effectively reads out the "with knowledge" requirement, we hold that it frustrates the clear intent of Congress. Section 1816(a) proscribed employing "with knowledge" an illegal worker.[8] Section 1816(b) merely set forth a means by which a farm labor contractor could demonstrate an absence of such knowledge; it was in the nature of an affirmative defense. Nor do we read the plain language of § 1816(b) to place an affirmative obligation on farm labor contractors to check the prescribed documents (though, certainly, they would benefit from doing so).[9]

---

[8]    This language requires a particular *subjective* mental state in order to find a violation of § 1816(a). "With knowledge" is synonymous with "knowingly". *See* Black's Law Dictionary 872 (6th ed. 1992). Such phrases are usually directed at, and descriptive of, an individual's own, conscious awareness of a particular fact. *See id. Cf.* **United States v. Smith**, 548 F.2d 545, 549 (5th Cir.) ("the Government must prove that the defendant *knowingly* did an act which the law forbids; that is to say *purposely intending* to violate the law") (emphasis added), *cert. denied*, 431 U.S. 959 (1977). Therefore, Congress sought to punish those who employed workers with an awareness of the workers' illegal status. The Secretary fails to cite any language in the statute which would support her interpretation. And, she fails to assert that § 1816 is silent or ambiguous on this issue, thereby abandoning any basis for deference to her interpretation of § 1816.

[9]    Of course, proof that a farm labor contractor both employs illegal workers and fails to check prescribed documents is evidence from which one might *infer* that the employer hired illegal workers "with knowledge".

The Secretary directs our attention to a prior decision by this court which cited 29 C.F.R. § 40.51(p) (repealed) as support for the proposition that a farm labor contractor "has an affirmative duty to inquire into a prospective employee's status as a United States citizen or person lawfully authorized to work in the United States." *See* **Counterman v. United States Department of Labor**, 776 F.2d 1247, 1248 (5th Cir. 1985). **Counterman** does not support the Secretary's interpretation. It involved the predecessor to the Act, namely, the Farm Labor Contractor Registration Act, 7 U.S.C. §§ 2041-2055 (repealed 1983); § 40.51(p) was promulgated by the Secretary under that act.

Unlike either the statute or regulation in issue here, § 40.51(p) required that a farm labor contractor "*must* evidence an *affirmative* showing of a *bona fide* inquiry of each prospective employee's status as" a legal employee. 29 C.F.R. § 40.51(p) (repealed) (emphasis added); *see generally*, **Counterman v. United States Dept. of Labor**, 607 F.Supp. 286, 288 (W.D. Tex), *aff'd*, 776 F.2d 1247 (5th Cir. 1985). Neither the regulation nor the statute in issue explicitly required such an affirmative showing.

### B.

Needless to say, the Secretary's conclusion that Garcia employed illegal workers must be, *inter alia*, supported by substantial evidence. 29 U.S.C. §§ 1813(c), 1853(c); 5 U.S.C. § 706(2)(E). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales**, 402 U.S. 389, 401 (1971) (quoting

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (citation omitted).

In situations in which an ALJ and a Secretary disagree, we "must examine the evidence and findings of the [Secretary] more critically than [we] would if the [Secretary] and the ALJ were in agreement." *See Syncro Corp. v. NLRB*, 597 F.2d 922, 924-25 (5th Cir. 1979) (citation omitted). Although this heightened scrutiny does not alter the substantial evidence standard of review, it does require us to apply it with a particularly keen eye, especially when credibility determinations are in issue, as discussed *infra*. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951).

Garcia began working as a farm labor contractor in 1983.[10] During the relevant time period (May 1983 - May 1985), he provided approximately 5,000 workers to Lower Valley farm owners. The area is noted for its "general chaos of movement and employment". He provided up to 120 workers per day. They were seldom the same workers day in and day out; the turnover rate was about 60% per day.

Garcia obtained a significant number of his workers from the Texas Employment Commission (TEC), which attempts to check the legal status of its referrals. Its officers frequent the fields in which their referrals are working for the purpose of investigating

---

[10]    Garcia quit school in Mexico after the sixth grade; he neither speaks nor reads English.

the legal status of workers at the site. Eli Vera, a TEC liaison officer, routinely visited the fields in which Garcia's workers were working, doing so at least weekly. While making these visits, he normally determined that all, or almost all, of Garcia's workers were legally employed. On those occasions when illegal workers were found at a Garcia site, they numbered four to five out of 100 to 150 workers.

1.

At the hearing, the Department presented only two witnesses who were not authorized to work in the United States and had worked for Garcia: Manuel Ortiz, on April 11, 1985; Ricardo Alvillar, on April 10-11, 1985.[11] Together, their testimony was proof that two illegal workers had been employed by Garcia for a collective total of three days. Alvillar had no contact with Garcia; it appears doubtful that Ortiz did.

In addition, Garcia admitted on cross that one of his foremen, Mr. Perea, was an illegal worker. The Secretary states that "Garcia admitted ... that he was aware that Perea was a citizen of Mexico and ... was not authorized to work in the U.S. at the time

---

[11] Ricardo Anaya, the Department's compliance officer who conducted the investigation, testified that, in April and May 1985, he took statements from ten persons being deported, whom he claimed had worked for Garcia: seven on April 11 (including Alvillar and Ortiz); two on May 1; and three on May 2. Of those ten, Anaya testified that only Alvillar and Ortiz could be located in order to testify; the Department offered the statements of the other eight into evidence. Garcia objected because, among other things, a pre-hearing order required the exchange of proposed exhibits, but the Department had not provided the statements to Garcia; the ALJ sustained the objection. In its offer of proof, the Department stated that the statements "would be cumulative" of Alvillar's and Ortiz's testimony.

he worked for Garcia."  Although technically accurate, this statement overreaches.  Garcia was asked:  "Are you aware that [Perea] *is* not authorized to seek employment in the United States?"  (Emphasis added.)  Garcia answered affirmatively.  This falls far short of establishing that Garcia was aware of Perea's illegal status when he employed him.  In fact, the ALJ found that "the evidence does not establish that [Garcia] knew, at the time Perea worked with him, that Perea could not lawfully accept employment."[12]

Thus, through these witnesses, the Department provided evidence that, at most, three individuals employed by Garcia were not authorized to seek employment in the United States, but offered no evidence that Garcia hired them with knowledge of their illegal status.

2.

The remaining evidence offered to prove violation of the Act was documentary.  Several documents were admitted by stipulation, but Garcia reserved the right to make objections as to weight or purpose.  Three documents are relevant to our review.

The first, exhibit 5, consisted of approximately 40 Immigration and Naturalization Record of Deportable Alien forms (I-213s), all dated April 11, 1985.  The I-213s reflect that they are prepared by Border Patrol officers prior to deporting illegal

_____

[12]    Indeed, the record supports the inference that Perea was no longer working for Garcia.  Garcia affirmed that Perea "was" one of his workers, suggesting that Perea no longer *is*.  This would be consistent with Garcia's standard operating procedure upon discovering illegal workers in his employ:  "let them go."

aliens. Most of the I-213s list Garcia as the employer of the deportable alien, a few do not, and some are illegible.[13] No evidence explains these forms in any meaningful respect; we cannot discern from them how they were generated, or how the reference to Garcia came to be on them.

The second document is exhibit 6, compiled by Ricardo Anaya, who conducted the investigation. It consists of a series of dates of deportation, with the names of persons deported (total of approximately 1800) on those dates. (As discussed *infra*, the same name is often listed under more than one date.) According to Anaya, the exhibit is a "daily summary ... made upon reviewing the [deportation] logs kept by the border patrol station", with the names being those shown in the logs as employed by Garcia. But, once again, we have no evidence clarifying the means by which these names came to be associated with Garcia.

The third document, exhibit 7, also prepared by Anaya, lists the 297 names that appear in exhibit 6 more than once. Of course, this list is not any more probative of Garcia's alleged knowing

---

[13] Apparently, the original exhibit has been lost; nevertheless, the contents are not in dispute. The Secretary acknowledges that two of the I-213s did not list Garcia as the employer. Also, she recognizes that at least 14 of the I-213s were illegible. In any event, we can infer the essential contents of the exhibit by referring to copies of the two I-213s provided in the record excerpts.

Likewise, it appears that exhibits 6 and 7, discussed *infra*, have been lost. But, copies of the first page of each are in the record excerpts. Once again, the contents are not in dispute; conflict only arises concerning the weight to be given the exhibits.

employment of illegal workers than the list from which it was derived.

In evidence was a certification by a Border Patrol officer that there are I-213s for all of the names on the lists. But, we agree with the ALJ that the lists do not prove that Garcia knowingly employed illegal aliens. The certification does not explain how an I-213 is generated; in other words, it does not add any explanation to the content of the I-213. Perhaps, as the district court noted, the certifying officer could have testified as to how the I-213s are generated. Such an explanation might have added to the weight we attach to these documents.

Although the Secretary presents contentions regarding the admissibility of these documents,[14] few are advanced to support the weight to be given them. Apparently referring to the I-213s, the Secretary asserts that the Department was not required to "produce the author of the item". Obviously, we agree; the Department does not have to produce the border agent who created each I-213 because of, among other things, the "improbability that he would recall the facts surrounding any one particular deportation." *See **United States v. Quezada***, 754 F.2d 1190, 1196 (5th Cir. 1985). Nevertheless, the Department should have called someone with sufficient knowledge to give "testimony relating to the procedures followed in keeping the records". *See **id.***

---

[14]    We do not doubt their admissibility; Garcia stipulated to that.

- 12 -

Finally, the Secretary maintains that the "trustworthiness and probative weight of these documents is assured by ... the integrity of public officials." More specifically, she contends that "[t]here is no indication ... that the ... officials involved were untrustworthy or incompetent in preparing these documents, nor is there any other reason to doubt the trustworthiness or accuracy of these records." Once again, we do not doubt this; but, simply stated, we do not know either how the I-213s were generated or how Garcia came to be associated with the deportable aliens identified on them. For example, did a Border Patrol agent engage in a thorough investigation of the deportee's employment history in this country and make an independent finding that Garcia had employed the illegal worker; or, did the agent put Garcia's name on the I-213 because an illegal alien said that he worked for him? In the absence of *any* factual basis in the record for determining the means by which Garcia has been identified on Border Patrol documents as an employer of deportable aliens, we agree with the ALJ that Anaya's testimony fell "short of making the necessary connection" between the I-213s and employment of illegal workers by Garcia.[15]

---

[15] The Secretary once again cites **Counterman**, claiming that it compels us to reverse the district court. Specifically, she asserts that in **Counterman**, "an ALJ based his holding that a [Farm Labor Contractor] had habitually hired illegal aliens solely on the testimony of one illegal alien witness and on [Border Patrol] logs and summaries introduced into evidence and testified to by a compliance officer." **Counterman**, however, does not thoroughly discuss the testimony surrounding the introduction of the logs and summaries. We simply do not know what testimony was introduced to explain them. In any event, it goes without saying that we cannot look to the records in other cases to determine whether the

We have serious doubts that the preceding evidence, offered by the Secretary, produced "more than a mere scintilla" of proof that Garcia employed illegal workers with knowledge. *See Spellman*, 1 F.3d at 360. In any event, there was additional evidence before the ALJ, involving some credibility determinations.

When evaluating whether substantial evidence supports the Secretary's conclusion, the "significance" of the ALJ's contrary conclusion "depends largely on the importance of credibility in the particular case." *Universal Camera*, 340 U.S. at 496; *see also Texas World Svc. Co. v. NLRB*, 928 F.2d 1426, 1431 (5th Cir. 1991). The Secretary does not dispute the ALJ's credibility determinations; rather, she disagreed with the probative weight the ALJ afforded the documentary evidence. Accordingly, we attach particular significance to the ALJ's credibility determinations in this case.

Garcia testified that he never knowingly employed illegal workers, and that when he became aware that one was in his employ, he would fire the worker. The ALJ determined that Garcia was "believable", and we attach significance to this credibility determination.

In addition, Vera, the TEC liaison officer, testified that he believed that Garcia never knowingly employed an illegal worker. Because Vera, a state officer, visited the fields in which Garcia's

---

Secretary's conclusion in this case is supported by substantial evidence.

workers were employed at least weekly for the purpose of ascertaining those workers' legal status, we attach particular weight to this testimony. The ALJ stated that he gave "special weight to Mr. Vera's testimony for the reason that he had no vested interest in the outcome of this proceeding other than his own reputation in this farming community." The ALJ questioned Vera extensively; obviously, the ALJ's credibility determination is significant.

Because the ALJ found Vera and Garcia credible, their testimony detracts from the weight to be afforded the evidence presented by the Department. *See Universal Camera*, 340 U.S. at 488 ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."); *Texas World Svc.*, 928 F.2d at 1431. In sum, canvassing the record as a whole, as we must, *see Universal Camera*, 340 U.S. at 488, we hold that the Secretary's conclusion that Garcia knowingly employed illegal workers is not supported by substantial evidence.

### III.

For the foregoing reasons, the judgment is

**AFFIRMED.**


KING, Circuit Judge, dissenting:

I concur in the majority's interpretation of 29 U.S.C. § 1816 (repealed 1986). However, because I believe that the record contains substantial evidence in support of the Secretary of

Labor's determination that Garcia knowingly hired or recruited aliens not authorized to work in the United States, I respectfully dissent.

*Statutory Interpretation*

The threshold issue in this case is whether we must accept the Secretary's interpretation of 29 U.S.C. § 1816 (repealed 1986) and its accompanying regulations. The Secretary argues that a farm labor contractor violates § 1816(a) if he knows or should reasonably know that he is hiring or recruiting aliens not authorized to work in this country. Section 1816(a) by its own terms appears to make actual knowledge that one is hiring unauthorized aliens an element of a violation. Section 1816(b) provides that a farm labor contractor can comply with § 1816(a) by examining and relying in good faith on certain prescribed documents evidencing that a prospective employee is entitled to work in this country. As the majority correctly points out, however, § 1816(b) does not purport to be the only way for a farm labor contractor to comply with § 1816(a). The Secretary argues that a presumption of knowledge should arise if a farm labor contractor is found to be employing unauthorized aliens in an area in which illegal immigration of agricultural workers is widespread, and that this presumption should be rebuttable only by compliance with § 1816(b) and its companion regulation, 29 C.F.R. § 500.59 (repealed) (prescribing the documents a farm labor contractor may use to verify employment status).

I agree with the majority that, in a proceeding brought under § 1816, the burden of proving actual knowledge remains on the government at all times. In the first place, this reading is consistent with the plain language of the statute, while the Secretary's interpretation is not. The case is analogous to Contract Courier Servs., Inc. v. Research and Special Programs Admin., 924 F.2d 112 (7th Cir. 1991). That case also involved a statute that proscribed certain conduct if done "knowingly." Id. at 113. The Department of Transportation, however, promulgated a regulation that included "should have known" within the meaning of "knew," and enforced its regulation against Contract Courier Services. Id. The Seventh Circuit reversed, holding that the statute prohibited the Department of Transportation from "obliterat[ing] any distinction between knowledge and ignorance." Id. at 114. The court also observed that "knew" and "should have known" may be equated if some rule of law penalizes a person's failure to make inquiry. Id. No such rule existed in that case, however, and no such rule has been called to our attention in the instant case. This is the key distinction between the instant case and Counterman v. United States Dep't of Labor, 776 F.2d 1247, 1248-49 (5th Cir. 1985), in which we emphasized that a regulation specifically imposed an affirmative duty of inquiry on farm labor contractors and that Counterman had not complied with that regulation. The regulation implementing § 1816(b) did not impose such an affirmative duty.

The successor statute to § 1816 also sheds some light on the proper interplay between §§ 1816(a) and (b). Section 1816 was replaced by 8 U.S.C. § 1324a of the Immigration Reform and Control Act (IRCA). IRCA, much like § 1816 before it, generally prohibits an employer from knowingly hiring an unauthorized alien. 8 U.S.C. § 1324a(a)(1)(A). Good faith compliance with the prescribed verification procedures is an "affirmative defense" to a charge that one has hired or recruited unauthorized aliens. 8 U.S.C. § 1324a(a)(3).[16] The legislative history explains how the IRCA affirmative defense works as follows. If an employer proves that he checked the required documents and retained the attested verification forms, he has established a "rebuttable presumption" that he did so in "good faith." At this point the burden shifts to the government to prove lack of good faith.

> It should be noted that this is not an absolute defense, and the government could rebut the presumption by offering proof that the documents did not reasonably appear on their face to be genuine, that the verification process was pretextual, or that the employer . . . colluded with the employee in falsifying documents, etc.
> Of course, even if the employer does not seek to establish an affirmative defense, the burden of proving a violation of the hiring, recruitment, or referral prohibition always remains on the government--by a preponderance of the evidence in the case of civil penalties and beyond a reasonable doubt in the case of criminal penalties.

H.R. Rep. No. 99-682(I), 99th Cong., 2d Sess. 57 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5661. The close similarity between the

---

[16] Interestingly, farm labor contractors are given special treatment under IRCA. Compliance with the prescribed verification procedures is now mandatory for such employers. 8 U.S.C. §§ 1324a(a)(1)(B)(ii), 1324a(b).

scheme set forth in IRCA for most employers and that set forth in § 1816 for farm labor contractors strongly suggests that they should operate the same way. Thus, as the majority concludes, the burden of proving that Garcia had actual knowledge that he was hiring unauthorized aliens remained at all times on the government.

*Substantial Evidence*

I disagree with the majority's conclusion that there is no substantial evidence in the record to support the Secretary's finding that Garcia knowingly hired unauthorized aliens. The majority concedes that evidence exists to support a finding that Garcia hired illegal aliens. What the records lacks, according to the majority, is substantial evidence that he did so knowingly. I turn first to the evidence that Garcia hired illegal aliens because the sheer volume of that evidence, in my view, raises an inference that he did so knowingly. Under the substantial evidence standard, the Secretary was entitled to draw that inference, and under the applicable standard of appellate review, we should defer to her decision to do so.

Two witnesses testified at the hearing before the ALJ that they were Mexican citizens not authorized to work in this country and that they had worked for Garcia. Texas Employment Commission Agent Eli Vera also testified that he repeatedly found unauthorized aliens working for Garcia (up to four or five on any given day) and that he informed Garcia of his discoveries on multiple occasions.

The exact number of unauthorized aliens that Garcia actually hired during the period in question is more difficult to discern.

By stipulation, several government exhibits were admitted into evidence. One exhibit was a collection of some forty I-213 forms, all dated April 11, 1985, many of which listed Garcia as the employer of deportable aliens. Another was a list of names of aliens deported during the period of the investigation totalling some 1800 names in all. The person who compiled the list testified that the list included the names of only those deported aliens whose I-213 forms listed Garcia as their employer. A second list showed the names of those unauthorized aliens whose names appeared on the first list more than once--almost 300 names. The majority gives slight credence to these exhibits because the government did not offer evidence to explain how the agents who prepared the I-213 forms determined that Garcia was the employer of the particular alien being deported. Admittedly, this evidence would carry far more weight if it were supported by the independent investigation of a border patrol agent than if it were merely the product of a brief interrogation of an illegal alien just prior to deportation. Without such support, it is difficult to attach a great deal of weight to the Secretary's documentary evidence. Nevertheless, I believe that a reasonable mind could accept the documentary evidence as adequate to support the conclusion that Garcia employed numerous unauthorized aliens, and that he in fact employed many of them on more than one occasion. These conclusions in turn permit the inference that Garcia employed unauthorized aliens knowingly.[17]

_____

[17] Many courts, it may be noted, accept "willful ignorance" as the equivalent of knowledge. See, e.g., Garcia v. Donovan, 101 Lab. Cas. ¶ 34,574 (CCH) (M.D. Fla. 1984) (interpreting § 1816). See

Thus, on the whole, I believe that substantial evidence supports the Secretary's finding in this case. The substantial evidence standard, it is well known, is a very low standard indeed. It requires evidence that amounts to more than a mere scintilla, but less than a preponderance. Additionally, under the substantial evidence standard we may not reweigh the evidence, nor may we try the issues de novo. Conflicts in the evidence are for the Secretary to resolve, not the courts. Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). In any event, the conflict in the evidence in the instant case is not great. Garcia denied any knowledge of the fact that he was employing unauthorized aliens, a denial belied by the evidence that he actually employed such aliens in droves. If the government's evidence is accepted that Garcia employed some 1800 unauthorized aliens during the period in question, this amounts to some 36% of his total work force during that time. The Secretary was entitled to trust the documentary evidence as circumstantial evidence of Garcia's knowledge over Garcia's self-serving denial. The Secretary was also entitled to discount Vera's testimony that Garcia lacked such knowledge. Even if we take Vera's credibility for granted, he could not have had direct knowledge of Garcia's mental state, and in fact he testified only that he had no reason to believe that Garcia had ever knowingly or intentionally employed any illegal aliens. The

---

generally Robin Charlow, Willful Ignorance and Criminal Culpability, 70 Tex. L. Rev. 1351 (1992).

Secretary could reasonably have resolved the conflict in the evidence against Garcia.

As the majority notes, the disagreement between the ALJ and the Secretary does not modify in any way the substantial evidence standard.  See Universal Camera Corp. v. NLRB, 340 U.S. 474, 496 (1951).  Although Garcia's credibility was certainly a factor in the ALJ's decision that the Secretary could not lightly dismiss, she was entitled to discount it in light of the conflict between Garcia's testimony and the "obvious inferences from the remainder of the record."  Delchamps, Inc. v. NLRB, 588 F.2d 476, 480 (5th Cir. 1979).  The Secretary is not bound to accept an ALJ's credibility determination over conflicting evidence, particularly when the ALJ relies on "testimony given by an interested witness, relating to his own motives."  Russell-Newman Mfg. Co. v. NLRB, 407 F.2d 247, 249 (5th Cir. 1969).  Thus, the ALJ's credibility determination as to Garcia was not binding on the Secretary in the instant case.  The ALJ's credibility determination as to Vera was certainly not binding; Vera's testimony, after all, was necessarily limited to his own beliefs about Garcia's knowledge.

Because a reasonable mind could accept the evidence presented by the government as adequate to support the conclusion reached by the Secretary, her findings should be affirmed.  Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).